MARY K. RIFFELMACHER *vs.* BOARD OF POLICE
COMMISSIONERS OF SPRINGFIELD & another.[1]

No. 88-P-224.

Hampden. December 8, 1988. — March 24, 1989.

Present: GREANEY, C.J., KAPLAN, & WARNER, JJ.

*Anti-Discrimination Law*, Sex, Prima facie case. *Evidence*, Expert opinion.

In an action by a female candidate for appointment as a permanent full-time
    police officer in the city of Springfield against the city and its board of
    police commissioners asserting discrimination against her based on sex,
    evidence that the plaintiff and other women applicants were treated
    disparately in relation to male applicants, that expressly-stated invidious
    standards were used in selecting candidates, and that the board's open-
    ended interviews of candidates showed uncontrolled subjectivity in the
    selection process was sufficient to warrant the jury's consideration of
    the plaintiff's claim and to support the jury's findings in favor of the
    plaintiff. [162-166]
In an action by a female candidate for appointment as a permanent full-time
    police officer in the city of Springfield against the city and its board of
    police commissioners asserting discrimination against her based on sex,
    the judge properly excluded, over the defendants' objection, testimony
    by a psychologist intended to show that it was relevant for board members
    to inquire of a candidate for the job, male or female, how the candidate's
    spouse felt about his or her becoming a police officer where, since the
    plaintiff did not question the relevance of the inquiry, expert testimony
    on that point would have been superfluous. [166]

CIVIL ACTION commenced in the Superior Court Department
on July 13, 1982.

The case was tried before *Cortland A. Mathers*, J.

*Nancy A. Healy*, Assistant City Solicitor, for the defendants.

*Thomas J. Oppenheimer* for the plaintiff.

[1] City of Springfield.

KAPLAN, J. The plaintiff, Mary K. Riffelmacher, sued the board of police commissioners of Springfield alleging that, in bypassing her for appointment as a permanent full-time police officer, the board, the appointing authority, had discriminated against her by reason of her sex in violation of G. L. c. 151B, § 4(1).[2] The action came to trial, a jury answered special questions in her favor,[3] and she has a judgment for damages (amount stipulated) and attorney's fees (see G. L. c. 151B, § 9). The defendants appeal claiming that the judge erred in declining to direct a verdict. We agree, in substance, with the plaintiff's contentions and her analysis of the facts and hold that the judge's ruling was correct. We mention also a question arising upon the judge's exclusion of testimony by a psychologist.

In addition to certain documentary materials, the plaintiff's case consisted of her testimony and testimony by two of a quorum of three commissioners (out of a board of five) who acted in her case and were called as adverse witnesses. These were Edward Keating (chairman of the board at the time of trial), and Samuel Marsella; Peter F. Carando, Jr., was not called. The defendants cross-examined the witnesses but, after offering and being denied the psychologist, they did not put in a case on their own behalf.

We sketch some basic facts (point I) and then deal with the record that bears more particularly on the issue of sex discrimination (point II).

I. In early 1977, the plaintiff applied to become an auxiliary police officer and was accepted after being interviewed by

---

[2] The first sentence of G. L. c. 151B, § 4(1), as amended through St. 1985, c. 397, § 4, provides in part: "It shall be an unlawful practice: 1. For an employer . . . because of the . . . sex . . . of any individual, to refuse to hire or employ . . . such individual . . . unless based upon a bona fide occupational qualification."

The parties stipulated that preconditions to an action in Superior Court had been satisfied (in distinction to an administrative proceeding before the Massachusetts Commission Against Discrimination). See. G. L. c. 151B, § 9.

[3] "1) Was the plaintiff . . . qualified for the position she sought?

"2) Was the failure of the defendant City of Springfield (acting through its Board of Police Commissioners) to hire the plaintiff based, in any way, upon her sex?"

police officials. She attended classes at the police academy over a period of six months, studying law enforcement, self-defense, weapons handling, and cardio-pulmonary resuscitation. Then in Fall, 1977, she "went out on the street," that is, walked foot patrol, including night patrol. She carried a nightstick and a gun and had power of arrest. She worked in all parts of the city, answered "911" emergency calls, and joined a "K-9" unit with a regular officer. She described her participation in a drug raid and in quelling a disturbance in which weapons were displayed and confiscated.

While an auxiliary officer, the plaintiff took the State civil service test for regular police officer and passed it. She complied with other statutory eligibility requirements: she was between the ages of nineteen and thirty-two (she was thirty-one), had graduated from high school, and qualified physically. See G. L. c. 31, §§ 58, 61A.

In 1980, Springfield had nineteen regular slots to be filled, and the State Division of Personnel Administration (DPA) certified a list of forty-one qualified candidates. Of these, twenty, including the plaintiff, expressed interest and wanted to be considered. The plaintiff ranked fifteenth of the twenty on the civil service list (taking any veterans' preferences into account). Fifteen were men and five women. The final hurdle for the candidates was an interview conducted by members of the board.[4]

As will be mentioned below (point IIC), the interviews were open-ended and unstructured. Since the conversations were not recorded (and it appears the members did not take notes), what occurred at the plaintiff's interview had to be reconstructed from the testimony above mentioned. The interview ran for fifteen or twenty minutes. Evidently the plaintiff was asked questions about her duties as an auxiliary (she had served for two years or more at the time),[5] whether her husband

---

[4] A commissioner with recollection back to 1974 indicated that all commissioners had been male.

[5] Actually the plaintiff continued to serve as an auxiliary after her rejection for a regular post and put in more than five years altogether.

approved her becoming a permanent officer and how he felt about her working a midnight shift, and how she proposed to take care of her two children (then aged about five and seven) when she was at work.

As noted, the plaintiff was bypassed, receiving notice of rejection on July 17, 1980. Fourteen men were appointed, including four who were below the plaintiff on the civil service list, and one woman, also below the plaintiff. The board's expressed reason for bypassing the plaintiff, as reported to DPA, was that she was "an introvert."[6]

II. The jury could find preponderant evidence of discrimination by the board in the following facts and circumstances: *A*, disparate treatment of the plaintiff and other women applicants in relation to male applicants; *B*, use of invidious standards expressly stated; *C*, uncontrolled subjectivity of the process. The jury could find that the reason assigned for bypassing the plaintiff was a pretext, that is, not the truly actuating reason.

*A.* Disparate treatment of the candidates is one of the factors leading to a conclusion that were the plaintiff a man, she would likely have been appointed.

(1) Both commissioners testified that prior experience of the candidates in police-related work was not a controlling factor in appointment, but there is considerable evidence that it was controlling for male candidates. Thus the reports on six successful male candidates (Delaney, Halpy, Hickson, Jacobson, McQuade, Moylan) stated that the selections were "due to" such experience (as police cadet, park ranger, auxiliary police officer).[7] The plaintiff's experience did not avail.

---

[6] The board wrote: "It was the consensus of the board that she emotionally would not be able to fulfill the obligations of a police officer. She did not respond clearly to the various questions that were asked and the board came to the conclusion that she was more of an introvert which in their opinion would not be conducive to a good police officer, therefore the board feels that Mrs. Riffelmacher would not have the capabilities to be able to provide the necessary obligations required of a police officer in the Springfield Police Dept."

[7] As the plaintiff observes, in three of these cases (Halpy, Moylan, Delaney) the reports also mention personal characteristics, but the words used and their near identity suggest it was experience that controlled appointment in these cases as well as in the other two. See also point *A* (3) below.

(2) As to one woman who was rejected, the report noted her "long record of different employment," and as to another bypassed woman, "her poor work record" of "numerous positions." But, as shown on their applications, one appointed male had thirteen jobs in six years (Hickson), a second was disciplined in prior employment (Moylan), and a third discharged (Moran). The defendants were unable upon request to furnish the applications of the two women, so their work records are not documented to allow for comparisons.[8] (These women were two of the three who outranked the plaintiff on the civil service list and were also rejected. The three ranked second, third, and fourth on the list.)

(3) The commissioners found that the plaintiff was prohibitively introverted and another woman not "mature." Her "poor work record" persuaded the commissioners that a third woman was not "stable."[9] On the other hand, when personality is cited in the reports of successful male candidates (seven of the fourteen appointed), the approving language appears standard or boilerplate. The jury could find to some probability that the commissioners started with a predisposition on the matter of personality in favor of the men, or that stereotyping was at work. Compare *Smith College* v. *Massachusetts Commn. Against Discrimination*, 376 Mass. 221, 228 (1978); *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination*, 20 Mass. App. Ct. 172, 176-177 (1985).

*B.* A conclusion of discriminatory treatment is often based on subtle interlocking factors that do not announce themselves. See *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 137 (1976). In the testimony of Commissioner Marsella, however, stereotyping to the disadvantage of female candidates is plainly present and might itself be enough to taint the treatment of the plaintiff. Although he

---

[8] The triers could draw an adverse inference from the lapse in the documentation. See *Graci* v. *Massachusetts Gas & Elec. Light Supply Co.*, 7 Mass. App. Ct. 221, 224 (1979); *Gage* v. *Westfield*, 26 Mass. App. Ct. 681, 692 (1988).

[9] There was an indication of psychiatric trouble in the history of the fourth woman who was rejected. The one man rejected also had such trouble.

said that men and women are "equally suitable" as police officers, he also said there were "some functions a police officer does that would be difficult for a woman." For example? "Use weapons, patrol certain high-crime areas, be left alone in high-crime areas, handle emotional problems with the same coolness maybe a man might, a lot of dangerous situations I wouldn't want to place a woman in, physical dexterity I think is greater than that of a woman." He said, "If I were a police officer I'd rather have a man who was physically able to handle himself to back me up, than a woman who's a lot more frail." And "yes," he was "troubled more having women with children as police officers than men with children."[10] Thus the witness appeared arbitrarily to attribute solely to men the qualities needed to accomplish major police tasks; in another sense, he assumed that certain job-negative qualities inhered in women generally, and then arbitrarily assigned those qualities to this plaintiff. See *Thorne* v. *City of El Segundo*, 726 F.2d 459, 465, 467-468 (9th Cir. 1983), cert. denied, 469 U.S. 979 (1984); *Fadhl* v. *City and County of San Francisco*, 741 F.2d 1163, 1165-1166 (9th Cir. 1984); *Pitre* v. *Western Elec. Co.*, 843 F.2d 1262, 1270 (10th Cir. 1988). See also Developments — Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1176-1186 (1971).

*C.* The selection process reached its climax at the interviews, and, as noted, these were open-ended and uncontrolled. The commissioners had no agreement on the subject matter to be covered, nor about the factors to be weighed or their relative importance. Questioning proceeded ad lib. In dealing with the psychological or emotional makeup of candidates, Commissioner Keating was not aided by any pertinent learning or any agreed "profile." Rather he relied on "gut feeling" (and he did not recall the interview with the plaintiff). Such an unbounded procedure is a "ready mechanism for discrimination." *Rowe* v. *General Motors Corp.*, 457 F.2d 348, 358-359 (5th Cir.

---

[10] From the applications, we know that two men who gained appointment were married (Halpy, Nutting), one having one child, the other two children; the plaintiff, as noted, was married with two children. The woman who was appointed was single, without children.

1972). Cf. *Smith College,* 376 Mass. at 231; *Sweeney* v. *Research Foundation,* 711 F.2d 1179, 1185-1186 (2d Cir. 1983).

As against the evidence summarized above, which supports the inference that the plaintiff suffered discrimination — that the reason given for rejecting her was a pretext or not the true reason[11] — the defendants offered "statistics," namely, the fact that fourteen of the thirty women considered for employment from 1973 to 1980 achieved it (47%).[12] The figures, as far as they go, offer some help to the defendants. So also the defendants point to the fact that a woman (Kowil) lower on the civil service list was appointed. This, too, may somewhat favor the defendants although it is open to explanation: first, the selection of this woman, who had no children, may merely emphasize, by contrast, the defendant's bias against women who, like the plaintiff, had children; second, in some respects, for example, in schooling, this woman's qualifications were superior to the plaintiff's, and so, while gender discrimination did not operate against her, it might still operate against the plaintiff (and other women) of lesser qualification. The point to be made is that the jury, giving weight to these elements of the case as tending to support the defendants, could still rationally find that the evidence as a whole preponderated in favor of the plaintiff.

We note that the briefs discuss a question raised in various discrimination cases, What is a "prima facie" plaintiff's case calling on a defendant to respond. See *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802 (1973); *Wheelock College,* 371 Mass. at 135; *Smith College,* 376 Mass. at 230; *Lewis* v. *Area II Home Care for Senior Citizens, Inc.,* 397 Mass. 761, 765 (1986). As indicated in *United States Postal Serv. Bd. of Governors* v. *Aikens,* 460 U.S. 711, 715 (1983), the question is not likely to require attention when an action has been fully

[11] If the reason given was a pretext, the plaintiff need not disprove it in her case, that is, establish that she was not an introvert. See *Trustees of Forbes Library* v. *Labor Relations Commn.,* 384 Mass. 559, 566 n.5 (1981).

[12] One hundred thirty-one of 235 males were hired (56%). (Variant statistics, also offered by the defendants, would show the figures to be 12:23 and 113:207, or 52% and 54%.)

tried on the merits. See also *Radvilas* v. *Stop & Shop, Inc.*, 18 Mass. App. Ct. 431, 441 n.19 (1984). We add that, if a prima facie case is made when the evidence barely preponderates toward a conclusion that discrimination has occurred, the plaintiff in the present case went that far and considerably farther.

III. Over the defendants' objection, the judge excluded testimony by a psychologist intended to show that it was relevant for board members to inquire of a candidate for the job, male or female, how the candidate's spouse felt about his/her becoming a police officer. As the plaintiff did not question the relevance of the inquiry, expert testimony on that point would have been superfluous. The problem throughout was to discern whether bias against female candidates was impelling the board to reject the plaintiff; such bias might be, and in the triers' view was, operative despite the board's asking some questions of apparent neutrality and relevance.

*Judgment affirmed.*