CITY OF SALEM vs. MASSACHUSETTS COMMISSION AGAINST
DISCRIMINATION & another.[1]

No. 94-P-1952.

Essex. February 6, 1996. - April 29, 1998.

Present: ARMSTRONG, JACOBS, & LENK, JJ.

*Anti-Discrimination Law,* Race, Damages, Attorney's fees. *Employment,*
Discrimination. *Massachusetts Commission Against Discrimination. Judg-
ment,* Preclusive effect. *Res Judicata. Administrative Law,* Substantial
evidence, Findings. *Damages,* Under anti-discrimination law, Back pay,
Mitigation, Emotional Distress, Interest, Attorney's fees. *Interest. Practice,
Civil,* Attorney's fees.

The dismissal in Federal District Court of an action brought under the Revenue
Sharing Act, 31 U.S.C. § 6721, against a city, its police department, and
its mayor for racially discriminatory employment practices, for the reason
that the repeal of the act rendered the case moot, was not a final judgment
on the merits for purposes of claim preclusion [638-639] or issue preclu-
sion [639-640], and the plaintiff was not barred from pursuing his claims
before the Massachusetts Commission Against Discrimination.

Substantial evidence supported the findings of a hearing commissioner of the
Massachusetts Commission Against Discrimination that a city's proffered
reasons for not hiring a black man as a police officer were pretexts
[640-645], and the commission's award of back pay and damages for
emotional distress was appropriate [645-646].

The Massachusetts Commission Against Discrimination was without authority
to impose interest on a judgment against a city awarding damages for
racial discrimination in employment [646-647] or on the award of at-
torney's fees [648-649].

The prevailing party in a claim under G. L. c. 151B, for racial discrimination
in employment, was entitled to attorney's fees. [647-648]

CIVIL ACTION commenced in the Superior Court Department on
December 23, 1992.

The case was heard by *Isaac Borenstein,* J.

*Mary P. Harrington* for the plaintiff.

[1]Charles Tyrone Brown.

*Michelle H. Blauner* (*Alan Jay Rom* with her) for Charles Tyrone Brown.

*George P. Napolitano*, for the Massachusetts Commission Against Discrimination, was present but did not argue.

ARMSTRONG, J. The city of Salem appeals from a judgment affirming a decision of the Massachusetts Commission Against Discrimination (MCAD), based on a finding by the MCAD's hearing commissioner (and later adopted by the full commission) that Salem's then police chief, Charles J. Connelly, in making patrolman appointments to the Salem police department in August, 1978, violated G. L. c. 151B, § 4, by denying the defendant Charles Tyrone Brown, a black man, an appointment because of his race. Partly because Brown pursued his complaint of discrimination before several tribunals, including proceedings before the Civil Service Commission, the United States Treasury Department's Office of Revenue Sharing, the MCAD, and several courts, and partly because the MCAD's first decision was reversed on appeal (see *Salem* v. *Massachusetts Commn. Against Discrimination*, 404 Mass. 170 [1989]), necessitating further hearings leading to the present decision, the matter has followed a complex and extraordinary course of litigation over what is now nineteen years.

1. *The procedural history.* In April, 1979, Brown filed a complaint with the MCAD alleging that he had been bypassed for employment in violation of his rights under G. L. c. 151B, § 4. A hearing on Brown's complaint was held in December, 1980, but the hearing commissioner died before making his decision. A new commissioner was appointed to review the record and to issue a proposed decision. In September, 1982, the new commissioner entered findings of fact, conclusions of law, and an order, finding that the Salem police department had violated G. L. c. 151B, § 4(1), by failing to hire Brown because of his race. On the city's appeal to the Superior Court, the judge concluded that the practice of appointing a substitute hearing officer to issue a decision based on the record in the event the original hearing officer is unable to do so, is only acceptable and reasonable when the credibility of witnesses is not in issue. The judge ordered that the MCAD decision be vacated and that the matter be remanded to the MCAD for a new hearing. In February, 1989, the Supreme Judicial Court affirmed the Superior Court judgment stating, inter alia, that there was conflicting evidence bearing on the question whether the police

department's reasons for not hiring Brown were a pretext, and that the new commissioner could not evaluate the credibility of the witnesses without observing their demeanor when testifying. *Salem* v. *Massachusetts Commn. Against Discrimination,* 404 Mass. at 174-175.

On remand to the MCAD, and after a new hearing in November, 1990, the hearing commissioner determined that the city, through its police department, had violated Brown's rights under G. L. c. 151B, § 4, by failing to hire him because of his race. The commissioner ordered that the city pay Brown the sum of $339,297.20, representing $239,297.20 in lost wages and benefits, and $100,000 in emotional distress damages, plus interest at the statutory rate of 12 percent per annum from the date of the filing of the complaint in 1979. The hearing commissioner's decision was affirmed by the full commission which, in addition, awarded Brown attorney's fees in the amount of $124,406.65 and costs in the amount of $3,168.34, to bear interest at the statutory rate of 12 percent per annum from May 22, 1991, the day Brown's counsel submitted his application for fees and costs. In July, 1994, a judge in the Superior Court affirmed both the decision of the full commission affirming the hearing commissioner's findings and decision, and the decision of the full commission awarding attorney's fees and costs to Brown.[2] This appeal followed.

2. *The facts.* The facts are, to a large extent, not in dispute. In July of 1978, the Salem police department called for a civil service list from which it could appoint four persons to entry-level police patrolman positions. The Division of Personnel Administration (DPA) forwarded a list of nineteen names, with Brown first on the list based on his having received the highest cumulative score on the civil service qualifying examination. The list was certified to the city on August 8, 1978. At the same time, the DPA notified (by mail) those listed that they were be-

---

[2]As we have indicated, Brown also filed a complaint with the Civil Service Commission alleging that he had been unlawfully bypassed for employment. Following two hearings, and after an appeal to the full commission, the Civil Service Commission in January, 1980, concluded that "the appointing authority's reasons for bypassing . . . [Brown] were sound and sufficient and were not discriminatory but were job-related." *Salem* v. *Massachusetts Commn. Against Discrimination,* 404 Mass. at 172. In July, 1979, Brown also filed an administrative complaint in the United States Treasury Department's Office of Revenue Sharing. We shall discuss the Federal proceedings more fully *infra.*

ing considered and advised them that within a ten-day period they should appear at police headquarters to sign the civil service list to signify their willingness to serve if appointed. The police department was then given twenty-one days to make its appointments, which included the ten-day sign-in period.

During previous hirings, Chief Connelly had interviewed candidates as they came in to sign the civil service list indicating their willingness to accept the appointment. For this appointment, however, he had decided to switch to a two-stage procedure, whereby in the first stage he spoke to each candidate briefly when he or she came in to sign the list, and, in the second stage, he interviewed the candidates at a scheduled appointment. One advantage was that the new system enabled Connelly to interview fewer candidates.[3]

Upon receiving the DPA notification, Brown appeared at the police station on August 15, 1978, and asked to see the chief. He waited for about an hour and was then shown into the chief's office. He indicated that he would accept the appointment if offered and signed the list. He asked Chief Connelly what position he occupied on the list, and he was told number one. On conflicting evidence, the hearing commissioner found that Chief Connelly did not tell Brown that any additional interview would be required, and did not verify Brown's current address and telephone number (as was Chief Connelly's usual practice).[4]

---

[3]The DPA instructions required the appointing authority to list the candidates who agreed to accept appointment in order of score. Then, if one candidate were to be appointed, the appointment was restricted to the first three names on the willing-to-serve list; if two, to the top five names; if three, to the top seven names; if four, as was the case here, to the top nine names. There was thus no point in interviewing the tenth willing candidate on down the list.

[4]Chief Connelly had died by the time of the second MCAD hearing in November, 1990. At the second hearing, the parties stipulated to the admission in evidence of the transcripts of the chief's testimony at the 1980 MCAD hearing and the 1984 hearing before the Office of Revenue Sharing. Those transcripts contain conflicting statements by Chief Connelly as to what he told Brown at the first stage of the interview process. The commissioner noted, for example, that although the chief testified in 1980 that he could not remember whether he had asked Brown for his name or phone number, he testified four years later at the Office of Revenue Sharing hearing that he did indeed ask Brown for his correct address. (Brown testified at the 1990 MCAD hearing that the chief did not tell him that he would be asked to come back for another interview and did not ask him whether his address and telephone number were correct.) In its brief, the city disregards the hearing commissioner's findings on the point and states, as fact, that Chief Connelly requested

Brown made no independent attempt to apprise Chief Connelly that he was no longer residing at the address shown on the list (157 Lafayette Street, Salem).[5]

When the top nine candidates were determined, Chief Connelly sought to notify them of the time of the second interview. The candidates were contacted by telephone or by the personal visit of a police officer. In Brown's case, no phone was listed, and when a police officer went to 157 Lafayette Street, he found that Brown had moved out about one year earlier. The officer then went to the post office and was shown a change of address card submitted by Brown so that his mail could be forwarded. He went to the indicated address (on Bartlett Street in Beverly) but was unable to locate Brown.

Meanwhile, Brown's former supervisor, Dog Constable Donald Famico, and Salem police Lieutenant Francis J. Wrigley both volunteered unfavorable information to Chief Connelly about Brown's activities as an assistant dog constable in Salem

---

verification of Brown's address and advised Brown that he would be contacted for a second interview. The city asserts, apparently with the Supreme Judicial Court's language in *Salem* v. *Massachusetts Commn. Against Discrimination,* *supra,* in mind, that "[i]f Connelly's testimony was not relied upon, one must assume that the commissioner did not believe his testimony but chose to believe Mr. Brown. This determination of credibility of witnesses was inappropriately made by the commissioner who neither saw nor heard all the witnesses." We disagree.

As a result of Chief Connelly's death, the hearing commissioner was faced with circumstances different from those existing at the time the Supreme Judicial Court rendered its decision. It is settled that when a witness has testified in a former proceeding on substantially the same issues, and has since died or become unavailable, his testimony at the former proceeding is admissible provided the former testimony can be substantially reproduced in all material respects. See *Ibanez* v. *Winston,* 222 Mass. 129, 130 (1915). See also G. L. c. 233, § 80; Mass.R.Civ.P. 32(a)(3), as amended, 392 Mass. 1105 (1984). Here, not only did the parties agree to the admission in evidence of the transcripts of Chief Connelly's testimony (there is no question as to the reliability of the transcripts), but Chief Connelly also was subjected to direct and cross-examination at both the 1980 and 1984 hearings. Thus, the earlier proceedings were of such a nature so as to provide the hearing commissioner with an adequate basis for evaluating Chief Connelly's credibility. Cf. *Commonwealth* v. *Siegfriedt,* 402 Mass. 424, 428-429 (1988).

[5]When he moved from the Lafayette Street address, Brown had his mail forwarded to a friend living at 13 Bartlett Street in Beverly. Brown received at the Bartlett Street address the DPA notice informing him that his name had been submitted on the certified list to the city. On August 15, 1978, Brown was residing at 28 Railway Avenue in Beverly.

from April, 1977, to April, 1978. (This was a CETA[6] job that had been scheduled to last for one year only.) Chief Connelly ordered Sergeant Herlihy of the department's internal affairs division to look into the Famico allegations and to produce a report, and also requested that Lt. Wrigley submit a statement.[7] No unsolicited negative information was received on any other candidate.

On August 28, 1978, Chief Connelly, after conducting second interviews with the other eight candidates who had signed the willing-to-serve list, selected four white candidates for appointment as entry-level police officers. Those candidates occupied the second, third, fourth, and ninth positions on the willing-to-serve list. Chief Connelly's selections were confirmed by the mayor of Salem on August 31, 1978.

On or about September 1, 1978, Brown went to Cleveland, Ohio, to be near his mother, who had become ill, and to assist in the care of his two younger sisters. He arranged for a friend to watch his mail and to call him in Cleveland in the event he received a letter from the city. Brown twice called Chief Connelly from Cleveland. In early September, 1978, Chief Connelly was unavailable to speak with Brown, but Brown left his name with the woman who answered the call. Several days after his first call, Brown spoke with the chief and asked whether he was going to get an interview (he did not consider his brief conversation with Chief Connelly when he appeared to sign the willing-

---

[6]Comprehensive Employment and Training Act.

[7]Famico's allegations concerned Brown's alleged use of abusive language and rudeness while an assistant dog constable. On August 31, 1978, Sgt. Herlihy produced two signed, unsworn statements (both dated August 31) from Sandra Coletti and Richard Savicky, the citizens who were involved in the alleged incidents. Lt. Wrigley's report, also dated August 31, 1978, detailed an incident in which the lieutenant questioned Brown as to his authority to have a police portable radio in his possession and then forcibly took the radio. Lt. Wrigley stated that Brown used foul language during the confrontation. Chief Connelly was aware of the incident between Lt. Wrigley and Brown prior to August, 1978, as he had apologized to Brown on behalf of the police department for Lt. Wrigley's reference to Brown as "boy" during the altercation. In addition, Chief Connelly received an undated "Officer's Report" from Salem police officer Arthur Callahan describing an incident between him and Brown which involved Brown's alleged improper parking of the Dog Constable's van in Chief Connelly's assigned parking space. Brown and Callahan exchanged heated words and, according to Callahan, Brown spat out of the van. Chief Connelly witnessed a portion of the incident from a distance but neither heard the words exchanged nor observed Brown spitting.

to-serve list as a job interview) and whether he was going to get the job. Chief Connelly did not respond to Brown's questions and did not tell Brown that he had been bypassed and that other candidates had been appointed.[8] Brown later telephoned the DPA from Cleveland to enquire about his status and was informed that no appointment had been made.

Although the four new officers began work on September 11, 1978, DPA approval was necessary to complete the formal appointment process, and this could not be secured until Chief Connelly indicated his reason or reasons for bypassing higher ranked candidates on the willing-to-serve list. When the chief forwarded the names of the successful candidates to the DPA on September 2, the reason he gave for the appointments was as follows: "After personal interviews with all eligible candidates, those selected were the most impressive." In response to the DPA's request for more specific information concerning the applicants, Chief Connelly, by letter dated January 18, 1979, wrote: "My specific reason for appointing . . . [the four new officers] . . . is the fact that I had interviewed nine candidates and found these applicants most impressive. For not appointing Charles Brown; he previously worked for our city Dog Constable and was in and out of our Police Station frequently. It was my impression that it would be difficult to train this man as a Police Officer." In a follow-up letter to the DPA dated February 2, 1979, the chief further explained his reasons: "[Brown] was involved in two incidents, once with a Lt. Wrigley and once with Patrolman Arthur Callahan. Both times in arguments with these men he displayed a temperament that convinced me that he would not be a very necessary [*sic*] even tempered Police Officer." The DPA rejected Chief Connelly's proffered justification for Brown's bypass as conclusory and asked that the reasons be stated in specific terms. The DPA also requested that Chief Connelly provide it with affidavits of members of the department, made on personal knowledge, describing incidents of disruption or threats by Brown. In yet another letter dated

---

[8]There was conflicting evidence as to other aspects of the telephone call. Chief Connelly testified that he asked Brown to stop in and speak with him when he (Brown) returned to Salem, ostensibly to discuss the complaints against Brown and, possibly, to pursue Brown's availability for future appointment. Brown testified that Chief Connelly said nothing to him as to what he should do when he returned. The hearing commissioner found that Chief Connelly was aware that Brown's eligibility for appointment ended with the expiration of the DPA list on November 5, 1978.

February 26, 1979, the DPA sent Chief Connelly a form requesting specific reasons for selection of the four successful applicants and the bypass of the five named unsuccessful candidates.[9] In virtually identical letters addressed to the DPA, both dated May 15, 1979, Chief Connelly stated his reasons for bypassing Brown and selecting the white applicants. Each letter stated that Brown had been bypassed because of "personal knowledge" of his behavior as an assistant dog constable. Each letter further recited that the named successful applicant "because of [his/her] demeanor during an interview would be the better selection, [he/she] was impressionable and extremely desirous of pursuing a career in law enforcement."[10] Also, in May, 1979, Chief Connelly sent to the DPA the statements of Coletti, Savicky, Wrigley, and Callahan relating to their encounters with Brown. The DPA approved and finalized the appointments of the four successful applicants on May 21, 1979.

Upon his return to Massachusetts from Ohio in early December, 1978, Brown sought assistance from an attorney to help him to obtain information on the Salem police appointments. After contacting the DPA, counsel informed Brown that no appointments had yet been made. The attorney provided Brown with the name of an individual at the DPA whom Brown could call for additional information. Brown called that individual twice a week between January and March, 1979, and was told consistently that no appointments had been made. In March, 1979, Brown was informed by counsel that Salem had appointed four police officers in August, 1978, to fill the vacant positions. It was Brown's first notice of the appointments. Upon learning that he had been bypassed, Brown filed his complaint

[9]The DPA also indicated that Chief Connelly's earlier submission of a certification and support supplement was incomplete and that Chief Connelly had failed to include Brown's name on the list he had originally submitted.

[10]At the MCAD hearing in 1980, Chief Connelly testified that he had known one of the appointees for over twenty years and another from the candidate's work as a reserve police officer with the Salem police department. A third successful applicant had experience as a security officer and a fourth spoke Polish fluently (there is a sizable Polish-American population in Salem). Had the chief interviewed Brown at the second stage of the hiring procedure, he might have learned, among other things, that Brown had attended college for two and one-half years and was an honorably discharged veteran of the United States Navy, where he had been trained in firefighting and gunnery. The chief might also have learned (as Brown later testified) that Brown's recollection of the Savicky incident was at odds with Famico's allegations and that Brown denied that the Sandra Coletti incident ever occurred.

with the MCAD setting in motion the procedure we have previously described.[11]

3. *Res judicata.* To understand the city's argument that the MCAD and, subsequently, the Superior Court, "should have dismissed [the present] action on the basis of res judicata," it is necessary to review the proceedings in the United States Treasury Department's Office of Revenue Sharing (ORS) and in the Federal District Court. In July, 1979, Brown filed an administrative complaint with the ORS seeking enforcement action to end racially discriminatory practices in the Salem police department and in the city of Salem. After an original investigation and numerous subsequent reviews, the ORS, in June, 1984, determined that the city was more likely than not in violation of 31 U.S.C. § 6716 (1982).[12] The ORS then sought to enforce its decision by bringing an administrative complaint against the city of Salem. After Brown's motion to intervene in the proceedings was allowed, a hearing was held before a United States administrative law judge who, applying the three-stage order of proof set out in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973), concluded that the ORS and Brown had failed to meet their burden of proving by a preponderance of the evidence that the reasons offered by the city of Salem (i.e., Brown's unavailability, his actions as an assistant dog constable, and his temperament) for not hiring Brown were not the true reasons but were a pretext for discrimination. The administrative law judge concluded that the city was in compliance with the Revenue Sharing Act and the regulations promulgated thereunder.

---

[11]Brown also alleged in his complaint with the MCAD that he had not been appointed a police officer in retaliation for his having filed a grievance with the Comprehensive Employment and Training Administration alleging discrimination on the part of the city. Upon investigation, the MCAD concluded that there was a lack of probable cause to support the "harassment" claim.

[12]Section 6716(a), as then in effect, provided, in relevant part: "No person in the United States shall be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a program or activity of a State government or unit of general local government because of race, color, national origin, or sex when the government receives a payment under this chapter." The ORS alleged that the city had been receiving and continued to receive funds under the Revenue Sharing Act (31 U.S.C. §§ 6701-6724 [1982]). Violation of § 6716 could result, for example, in a suspension or termination of payments to a State government or unit of general local government. See, e.g., 31 U.S.C. § 6718.

Following the affirmance of the decision of the administrative law judge by the Assistant Secretary of the Treasury, Brown, in August, 1985, brought an action in the United States District Court for the District of Massachusetts against the city, its police department, and its mayor. See 31 U.S.C. § 6721 (1982).[13] While Brown's action was pending, and prior to trial, the Revenue Sharing Act was (in 1986) repealed by Pub. L. No. 99-272, § 140001(a)(1), 100 Stat. 327. In July, 1988, the parties entered into a stipulation dismissing the District Court action with prejudice and without fees and costs.

Some ten months after the District Court action was dismissed, the city moved to dismiss the MCAD action (then pending before the MCAD after remand from the Supreme Judicial Court) on the grounds that the decision of the Department of the Treasury was final and binding on all parties as a result of Brown's voluntary dismissal of the District Court complaint with prejudice.[14] The hearing commissioner denied the motion as well as the city's renewed motion to dismiss made at the hearing. In affirming the decision of the full commission, the Superior Court judge concluded that the hearing commissioner's refusal to apply the doctrine of res judicata "was not an abuse of discretion, for to have done so would have led to an inequitable result." Continuing, the judge stated: "The District Court's dismissal was not a final judgment for purposes of the res judicata doctrine, because the dismissal obviously was not intended as an adjudication on the merits. As

[13]Section 6721(a) provided in relevant part: "When a State government, a unit of general local government, or an officer or employee of a State government or unit of general local government acting in an official capacity, engages in a practice prohibited by this chapter, a person adversely affected by the practice may bring a civil action in an appropriate district court of the United States or a State court of general jurisdiction. Before bringing an action under this section, the person must exhaust administrative remedies under subsection (b) of this section." In an action brought under § 6721, the court could grant a temporary restraining order, an injunction or "another order, including suspension, termination, or repayment of, payments under this chapter or placement of additional payments under this chapter in escrow pending the outcome of the action." See generally *Cohen* v. *West Haven Bd. of Police Commrs.*, 638 F.2d 496, 500-502 (2d Cir. 1980) (suggesting that similar language in an earlier version of the statute allowed a court to enter a back-pay order).

[14]The city stated in its motion that the decision met "all the requirements of *res judicata as the standard has been announced by the MCAD*" (emphasis supplied).

the plaintiff has asserted, the parties entered into a stipulation of dismissal because the Federal Revenue Sharing Act had been repealed prior to the date the District Court appeal was scheduled to be heard, and it was thus not reasonable to continue the appeal since the Office of Revenue Sharing was no longer in existence and any decision of the District Court would have been moot."[15]

" 'Res judicata' is the generic term for various doctrines by which a judgment in one action has a binding effect in another." *Heacock* v. *Heacock*, 402 Mass. 21, 23 n.2 (1988). It comprises "claim preclusion" (traditionally known as "merger" or "bar," and also referred to as true res judicata) and "issue preclusion" (traditionally known as "collateral estoppel"). *Ibid.* See *Anderson* v. *Phoenix Inv. Counsel of Boston, Inc.,* 387 Mass. 444, 449 (1982); *Blanchette* v. *School Comm. of Westwood,* 427 Mass. 176, 179 n.3 (1998). When a State court is faced with the issue of the preclusive effect of a Federal court's judgment, it is the Federal law of res judicata which must be examined. *Anderson* v. *Phoenix Inv. Counsel of Boston, Inc., supra. Hayes* v. *Orleans,* 39 Mass. App. Ct. 682, 683 (1996).

The city argues that because the decision of the Department of the Treasury satisfied the "standards" looked to by the MCAD in determining whether to apply the doctrines of res judicata and collateral estoppel,[16] and because the dismissal of Brown's District Court action was a final judgment on the merits

---

[15]While contesting that the repeal was Brown's motive for terminating the Federal action, the city does not challenge the judge's determination that the Revenue Sharing Act was, essentially, a dead letter at the time Brown stipulated to the dismissal (or the judge's implicit determination that there was no meaningful relief available to Brown). Neither party has discussed the provisions of the repealing legislation or the status, for example, of the State and Local Government Fiscal Assistance Trust Fund established under the Act. In the circumstances, we treat the effect of the repealing legislation as did the judge.

[16]The city, citing to several decisions of the MCAD, states that the MCAD has accepted the applicability of the doctrines of collateral estoppel and res judicata to its proceedings, as long as there is an identity of parties, a formal adjudicatory proceeding, similar statutory, regulatory or contractual standards, and the achievement of the public policy the MCAD was created to serve. However, as Brown notes, the MCAD has made clear in its decisions, including one cited by the city, that it will apply the doctrines with discretion in G. L. c. 151B actions. See *Jones* v. *Walter E. Fernald State Sch.,* 2 Mass. Discrimination L. Rep. 1005, 1007 (1980); *Waithe* v. *Methuen,* 2 Mass. Discrimination L. Rep. 1329, 1330-1331 (1980); *Pardo* v. *Callahan,* 6 Mass. Discrimination L. Rep. 1893, 1900-1901 (1984). Indeed, in her order on the

for purposes of res judicata, the MCAD and the Superior Court erred in failing to give preclusive effect to the Federal proceedings. We disagree.

(a) *Claim preclusion.* "The doctrine of claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action." *Heacock* v. *Heacock*, 402 Mass. at 23. See *Allen* v. *McCurry*, 449 U.S. 90, 94 (1980). "The doctrine is a ramification of the policy considerations that underlie the rule against splitting a cause of action . . . ." *Heacock* v. *Heacock, supra* at 24. Here, the city invokes the general rule that "[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction . . . out of which the action arose." Restatement (Second) of Judgments § 24(1) (1982). See *Fluhr* v. *Allstate Ins. Co.*, 15 Mass. App. Ct. 983, 984 (1983). Even if we were to assume that the general rule concerning claim splitting has possible application in the present case, the rule is subject to certain exceptions, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation. See *Bio-Technology Gen. Corp.* v. *Genentech, Inc.*, 80 F.3d 1553, 1563 (Fed. Cir.), cert. denied, 519 U.S. 911 (1996); *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); Restatement (Second) of Judgments § 26(1)(c) (1982) (referring specifically to a plaintiff's inability to seek a certain remedy in the first action). Cf. *Blanchette* v. *School Comm. of Westwood*, 427 Mass. at 181, 185. As stated by the Restatement (Second) of Judgments § 26 comment c:

"The general rule . . . is largely predicated on the as-

city's motion to dismiss, the hearing commissioner stated that "both *res judicata* and *collateral estoppel* are equitable doctrines which the commission is not bound to apply" (emphasis original). Compare *Bar Counsel* v. *Board of Bar Overseers*, 420 Mass. 6, 11-12 (1995). See also *Gloucester Marine Railways Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. 386, 391 (1994) ("Since claim preclusion is grounded upon considerations of fairness and efficient judicial administration, the doctrine is not applied rigidly where such interests would not be served"). But compare *Federated Dept. Stores, Inc.* v. *Moitie*, 452 U.S. 394, 401-402 (1981); *Hayes* v. *Orleans*, 39 Mass. App. Ct. at 686.

sumption that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first."

In the instant matter, the city concedes in its brief that the remedies available to Brown were different before the ORS and in the MCAD. Both parties seem to agree that "[w]hile ORS'[s] leverage is the loss of revenue sharing funds unless the City of Salem complies with 'make-whole relief' . . . , the MCAD has the authority to order such direct relief." Moreover, the city does not dispute that the repeal of the Revenue Sharing Act left Brown with no remedy or form of relief in the Federal District Court (see notes 13 & 15, *supra*). In the circumstances, the court did not err in concluding (implicitly) that the proceedings in the MCAD were not barred by the doctrine of claim preclusion.[17]

(b) *Issue preclusion.* The doctrine of issue preclusion prevents relitigation of an issue determined in an earlier action when the same issue arises in a later action, based on a different claim, between the same parties or their privies, and the determination was essential to the decision in the earlier action. See *Montana* v. *United States*, 440 U.S. 147, 153-154 (1979); *Amgen, Inc.* v. *Genetics Inst., Inc.*, 98 F.3d 1328, 1331 (Fed. Cir. 1996); *Heacock* v. *Heacock*, 402 Mass. at 23 n.2, 25; *McCarthy* v. *Oak Bluffs*, 419 Mass. 227, 232-233 (1994); Restatement (Second) of Judgments § 27 (1982). As with the doctrine of claim preclusion, there are exceptions to the general rule of issue preclusion. Restatement (Second) of Judgments § 28 (1982). One such exception, here relevant, is embodied in § 28(1) and provides that relitigation of an issue in a subsequent action between the parties is not precluded where "[t]he party against whom preclu-

---

[17]We are also mindful of the city's invitation to the MCAD to look, in addition, to its own standards in determining whether to apply the doctrines of claim and issue preclusion.

sion is sought could not, as a matter of law, have obtained review of the judgment in the initial action."[18] See generally *Alliance to End Repression* v. *City of Chicago*, 820 F.2d 873, 875 (7th Cir. 1987) (unappealable decisions often lack preclusive effect between the parties). See also *Sena* v. *Commonwealth*, 417 Mass. 250, 260 (1994) ("We now state conclusively that for collateral estoppel to preclude litigation of an issue, there must have been available some avenue for review of the prior ruling on the issue").

We think that the facts in the present case fall generally within the exception set out in § 28(1). Brown filed his personal action in the Federal District Court after he had exhausted his administrative remedies. Whether the Federal action is characterized as an "appeal," as the city asserts, or as a "de novo" proceeding, as Brown asserts, it is clear that the District Court judge had authority to make an independent finding as to whether the city had discriminated against Brown. See 31 U.S.C. § 6721(b). As we have indicated, the Superior Court judge proceeded below on the theory (not disputed by the parties) that the Revenue Sharing Act was, essentially, a dead letter upon its repeal. Thus, from all that appears in the record, at the time Brown filed his stipulation of dismissal with prejudice, he was effectively disabled from obtaining meaningful (i.e., consequential) review. In the unusual circumstances present here, we cannot say that the judge erred in ruling that the proceedings in the MCAD were not barred by the doctrine of issue preclusion.[19]

4. *Substantial evidence.* We turn next to the city's argument that certain findings of the MCAD were not supported by substantial evidence. We will affirm a decision and order of the MCAD unless the findings and conclusions are unsupported by

---

[18]Restatement (Second) of Judgments § 28 comment a states: "There is a need for an analogous exception to the rule of preclusion when the determination of an issue is plainly essential to the judgment but the party who lost on that issue is, for some other reason, disabled as a matter of law from obtaining review by appeal or, where appeal does not lie, by . . . statutory review procedure. Such cases can arise, for example, because the controversy has become moot, or because the law does not allow review of the particular category of judgments."

[19]In view of the foregoing discussion, we do not consider the additional reasons proffered by Brown concerning the inapplicability of the doctrine of res judicata.

substantial evidence[20] or based on an error of law. G. L. c. 151B, § 6. G. L. c. 30A, § 14(7). *Ramsdell* v. *Western Mass. Bus Lines, Inc.,* 415 Mass. 673, 676 (1993). See *School Comm. of Brockton* v. *Massachusetts Commn. Against Discrimination,* 423 Mass. 7, 11 (1996); *Talbert Trading Co.* v. *Massachusetts Commn. Against Discrimination,* 37 Mass. App. Ct. 56, 58 n.1 (1994). Because our review is a limited one, we "defer to an administrative agency's fact-finding role, including its right to draw reasonable inferences from the facts found." *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. 221, 224 (1978). *Ramsdell* v. *Western Mass. Bus Lines, Inc., supra* at 676. In evaluating the substantiality of the evidence before the MCAD, we must consider anything in the record that fairly detracts from the weight of the evidence supporting the MCAD determination. See *Cohen* v. *Board of Registration in Pharmacy,* 350 Mass. 246, 253 (1966); *School Comm. of Brookline* v. *Bureau of Special Educ. Appeals,* 389 Mass. 705, 716 (1983); *Lisbon* v. *Contributory Retirement Appeal Bd.,* 41 Mass. App. Ct. 246, 257 (1996). See also *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. at 231.

In applying the Massachusetts antidiscrimination statute (G. L. c. 151B), the MCAD and the Superior Court looked properly to the familiar, three-stage analysis set forth by the United States Supreme Court under the Federal antidiscrimination provisions of Title VII. See *Wheelock College* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. 130, 134-136 (1976), citing to *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973). See also *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 440-441 (1995); *Labonte* v. *Hutchins & Wheeler,* 424 Mass. 813, 821 (1997); *Matthews* v. *Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 127-128 (1997). Thus, Brown bore the initial burden of establishing a prima facie case of racial discrimination. *Blare* v. *Husky Injection Molding Sys. Boston, Inc., supra* at 441. *Matthews* v. *Ocean Spray Cranberries, Inc., supra* at 128. The burden then shifted to the city to articulate a legitimate, nondiscriminatory reason for its hiring decision. *Blare, supra. Matthews, supra. Brownlie*

---

[20] " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6). *School Comm. of Brockton* v. *Massachusetts Commn. Against Discrimination,* 423 Mass. 7, 11 (1996).

v. *Kanzaki Specialty Papers, Inc.,* ante 408, 413 (1998). Once the city met that burden, the presumption of discrimination vanished, and the burden returned to Brown to persuade the court, by a fair preponderance of the evidence, that the city's proffered reason for its employment decision was not the real reason, but a pretext. *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.),* 427 Mass. 1, 12 (1998). See *Wheelock College* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. at 139.[21] The burden of persuasion rests with the plaintiff at all times. *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.), supra* at 12.

In the case at bar, neither party challenges the MCAD's (and the court's) determinations that (1) Brown had established a prima facie case,[22] and (2) the city had articulated legitimate, nondiscriminatory reasons for its hiring decision, i.e., Brown's unavailability for an interview and his temperament. Rather, the battle has been joined at the third stage of the analysis. The city challenges, as unsupported by substantial evidence, the finding that the city's reasons were a pretext.

"Because 'smoking gun' evidence is rare, the plaintiff may, and more often than not must, carry his burden of persuasion with circumstantial evidence that convinces the fact finder that the proffered explanation is not credible." *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. at 445 (citation omitted). Evidence which is or may be relevant to a plaintiff's showing of pretext for racial discrimination includes an employer's differential treatment of an employee (or, as here, an applicant

---

[21]We note that both the MCAD and the judge conceptualized the standard to which they were holding Brown as one of showing that the city's articulated reasons for the bypass were actually a pretext for unlawful discrimination. Thus, in *this* opinion, it is not necessary to concern ourselves with the question whether Massachusetts law applies a "pretext only" standard, as indicated at one point in *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. at 445, or a "pretext plus" standard, as suggested by the formulation in *Matthews* v. *Ocean Spray Cranberries, Inc.,* 426 Mass. at 128-129. See *Dartt* v. *Browning Ferris Indus., Inc. (Mass.),* 427 Mass. at 12; *Handrahan* v. *Red Roof Inns, Inc.,* 43 Mass. App. Ct. 13, 18-19 (1997); *Brownlie* v. *Kanzaki Specialty Papers, Inc.,* ante at 417 (1998); *"Blare v. Husky": Is It Really Dead?,* 26 Mass. Law. Wkly. 1553, 1574 (1998); *Pretext Revisited: "Matthews v. Ocean Spray,"* 26 Mass. Law. Wkly. 1667, 1692, 1693 (1998).

[22]The hearing commissioner determined that Brown was a member of a protected class, that he was qualified for the position of police officer, that he was not hired despite his qualifications, and that he was bypassed for the available positions for four lesser ranked white applicants.

for employment) based on his race, *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. at 129 & 130 n.4; *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination*, 20 Mass. App. Ct. 172, 176 (1985); an employer's general practices and policies concerning employment of racial minorities, *Matthews* v. *Ocean Spray Cranberries, Inc.*, *supra* at 130 n.4; and an employer's use of uncontrolled subjectivity in the hiring process. Cf. *Riffelmacher* v. *Board of Police Commrs. of Springfield*, 27 Mass. App. Ct. 159, 162 (1989). The fact finder may properly take into account "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Fuentes* v. *Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). *Morgan* v. *Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

As for the first nondiscriminatory reason proffered by the city — that Brown was not offered a position because he could not be reached for the second-stage interview — there was evidence. that Brown's application was treated differently than the applications of the white candidates for the position. The hearing commissioner found, in accordance with Brown's testimony, that Chief Connelly did not tell Brown that another interview would be required (and was imminent) and did not ask him to verify his current address and telephone number.[23] Moreover, the chief, in attempting to locate Brown, failed to use the mail, although he was aware that the Civil Service Commission had used the mail to notify Brown of his eligibility for available positions and that Brown had appeared promptly at the police station to sign the willing-to-serve list. In addition, Chief Connelly did not list Brown's unavailability on any of the numerous documents submitted to the DPA as a reason for the bypass.

As against this evidence, the city points to the facts (among others) that Brown failed to volunteer his new address and that

[23]In its 1989 decision, the Supreme Judicial Court characterized as "pivotal to an evaluation of Brown's allegations" whether Chief Connelly asked for Brown's address and telephone number, and whether the chief knew of the racial overtones of the incident with Lt. Wrigley. *Salem* v. *Massachusetts Commn. Against Discrimination*, 404 Mass. at 175. When testifying before the MCAD in 1980, Chief Connelly acknowledged the importance of verifying each applicant's address in view of the fact that the Civil Service examination was given "a long time prior to [the] interview[s]." Although, as we have stated, the chief could not recall in 1980 whether he asked Brown to verify his address, he "assume[d]" that he had because he *"did it with everybody else"* (emphasis supplied).

it made some efforts to contact him. While helpful to the city, this evidence did not explain, for example, why the chief failed to adhere to his usual procedures when dealing with Brown and failed to list Brown's unavailability as a reason for the bypass. Even considering the opposing evidence, we think there was still substantial evidence to support the MCAD's determination that the reason proffered was a pretext. See *Talbert Trading Co.* v. *Massachusetts Commn. Against Discrimination*, 37 Mass. App. Ct. at 63. Cf. *Riffelmacher* v. *Board of Police Commrs. of Springfield*, 27 Mass. App. Ct. at 165.

There was also substantial evidence to support the MCAD's determination that the second reason proffered by the chief — that Brown was of unsuitable temperament to be a police officer because of the four incidents in which he was allegedly involved — was a pretext. At the outset, it bears emphasis that, according to the evidence, Brown's application was handled differently than the applications of the white candidates. The disparate treatment of Brown kindled doubt concerning the entire hiring process.[24] Against that background, the chief's reliance on an incident (the Wrigley incident) that he knew had racial overtones, and other incidents that had not occasioned contemporaneous reports or complaints; the chief's failure to secure the investigative reports and statements concerning the four incidents prior to making his selection of the four white candidates; the chief's failure to mention the reports to Brown during his telephone conversation with Brown in September, 1978 (prior to the DPA's final approval of the appointment of the four white applicants); the chief's failure to offer originally the four reports as the reason for Brown's bypass (and the chief's development of numerous additional reasons for the bypass as the matter proceeded); and the chief's utilization of an open-ended, uncontrolled, and, by his own admission, "ad lib" hiring process, see *Riffelmacher* v. *Board of Police Commrs. of Springfield*, 27 Mass. App. Ct. at 162, 164 (such an unbounded procedure is "a ready mechanism for discrimination"), in combination supported the finding that the reasons given for the bypass were a pretext.

While the city offered some favorable statistical evidence of

---

[24]In view of the disparate treatment accorded Brown with regard to the verification of his address and telephone number, Chief Connelly's testimony that he would have liked to speak with Brown to discuss the four alleged incidents rang hollow to the hearing commissioner.

Chief Connelly's minority hiring record, see *Springfield Bd. of Police Commrs.* v. *Massachusetts Commn. Against Discrimination*, 375 Mass. 782, 782-783 (1978),[25] and marshalled with some force the evidence supporting a contrary determination, we conclude that the MCAD's determination that the reasons advanced for Brown's bypass were mere pretexts was based on evidence that a reasonable person could accept as adequate to support these conclusions. See *Northeast Metropolitan Regional Vocational Sch. Dist. Sch. Comm.* v. *Massachusetts Commn. Against Discrimination*, 31 Mass. App. Ct. 84, 90 (1991).

5. *Damages.* Upon a finding of discrimination, the MCAD has authority to grant such relief as is appropriate, including lost wages and benefits, damages for emotional distress, and, in appropriate circumstances, compensatory damages for loss of future earning capacity. See *Lavelle* v. *Massachusetts Commn. Against Discrimination*, 426 Mass. 332, 337 (1997); *Northeast Metropolitan Regional Vocational Sch. Dist. Sch. Comm.* v. *Massachusetts Commn. Against Discrimination*, 31 Mass. App. Ct. at 90; *Talbert Trading Co.* v. *Massachusetts Commn. Against Discrimination*, 37 Mass. App. Ct. at 65. In view of the ongoing proceedings before the MCAD, we do not think that the judge erred in rejecting the city's contention that the award for back pay should have terminated no later than January, 1985 (the date when the United States administrative law judge ruled in favor of the city in the ORS proceeding). The city's claim that Brown failed to mitigate his damages loses sight of the fact that the burden of proof on mitigation is on the employer. See *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination*, 20 Mass. App. Ct. at 185; *J.C. Hillary's* v. *Massachusetts Commn. Against Discrimination*, 27 Mass. App. Ct. 204, 208-209 (1989). Here, the record reflects that Brown made reasonable attempts to secure employment during the periods at issue and, in fact, held a number of different jobs. Brown also drew unemployment compensation (and received medical benefits) from time to time, which sums the MCAD also subtracted from the financial damages award.

The city claims that the award of damages for emotional distress ($100,000) is "wholly unsubstantiated," but " '[t]he finding of [discrimination] alone permit[s] the inference of

[25]For example, Chief Connelly offered a patrolman's position to the only minority candidate on the November, 1976, list. He also appointed the police department's first black patrolman in 1977.

emotional distress as a normal adjunct of the [employer's] actions.' It necessarily follows that in c. 151B cases an award of emotional distress damages can be sustained even in the absence of physical injury or psychiatric consultation." *Labonte* v. *Hutchins & Wheeler,* 424 Mass. at 824, quoting from *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination,* 20 Mass. App. Ct. at 182. Moreover, there was evidence, in the form of Brown's testimony, that the chief's decision to bypass him left him "stressed . . . out" and "basically hurting."[26] See *Talbert Trading Co.* v. *Massachusetts Commn. Against Discrimination,* 37 Mass. App. Ct. at 65 ("hearing commissioner's finding that the employee suffered emotional [distress] as [a] direct result of losing his job was supported by substantial evidence in the form of compelling testimony by the employee"). As for the city's contention that the amount of the award for emotional distress was excessive based on the evidence presented, we cannot say that the amount "does not relate reasonably to the emotional distress suffered by [Brown]," or otherwise represents a miscarriage of justice. Compare and contrast *Labonte* v. *Hutchins & Wheeler,* 424 Mass. at 824-826 (award of $550,000 for emotional distress vacated).

Finally, the city challenges the imposition of interest on the damages award. Interest on MCAD awards does not lie against the Commonwealth or its instrumentalities (as here) in the absence of express statutory authority. See *Boston* v. *Massachusetts Commn. Against Discrimination,* 39 Mass. App. Ct. 234, 245-246 (1995), and cases cited. The principle of that decision presents an application of the doctrine of sovereign immunity, as explained in *Onofrio* v. *Department of Mental Health,* 411 Mass. 657, 659 (1992), a doctrine which, despite different historical bases, is normally treated as applying to the Com-

---

[26]Brown testified that when he learned he had not been appointed he went home and cried. He further stated that because he knew he should have been hired, every time he saw a police officer, he thought: "That's what I should have been." "It still hurts," he added. The hearing commissioner found that "the denial of the position of police officer had caused Brown significant emotional distress over the years," concluding that "[i]t is clear to me both by a review of the evidence and my observation of the Complainant as he testified before me, that his desire to be a police officer was strong. His dashed hopes after learning that he was ranked first among many and was still passed over brought him great distress. His hopes and aspirations of becoming a police officer were destroyed completely by the unlawful and discriminatory conduct of the [city]."

monwealth and to municipalities without important distinction. See *Morash & Sons, Inc.* v. *Commonwealth*, 363 Mass. 612, 616-618 (1973). The judgment of the Superior Court, which was entered prior to our decision in *Boston* v. *Massachusetts Commn. Against Discrimination, supra*, should be modified to strike the interest component from the MCAD order.

6. *Attorney's fees.* General Laws c. 151B, § 5, was amended by St. 1989, c. 722, § 27, to allow a complainant who prevails before the MCAD to be awarded reasonable attorney's fees and costs. The city's argument that the MCAD should not have given retroactive effect to the attorney's fees amendment is foreclosed by the Supreme Judicial Court's decisions in *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 320 n.11 (1993), and *School Comm. of Brockton* v. *Massachusetts Commn. Against Discrimination*, 423 Mass. at 16.[27]

We also reject the city's argument that Brown was not entitled to attorney's fees for work performed prior to March, 1989. The city notes (correctly) that the complainant must be a "prevailing party" in order to be awarded attorney's fees. The city asserts, however, that it (not Brown) was the prevailing party in the proceedings prior to the Supreme Judicial Court's remand of the matter in February, 1989, and that Brown "only prevailed" at the second hearing before the MCAD. Citing *Hensley* v. *Eckerhart*, 461 U.S. 424, 433-435, 440 (1983),[28] for the proposition that a plaintiff is entitled to a fee award only on those claims on which he was successful, the city asserts that the judge should not have "considered" the fees incurred by Brown between 1980 and March, 1989.

A review of the history of the present litigation, as detailed in section one of this opinion, reflects that neither the Superior

---

[27]The city's two-sentence assertion that Brown "waived" his rights to attorney's fees does not rise to the level of appellate argument as contemplated by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Lolos* v. *Berlin*, 338 Mass. 10, 13-14 (1958). In any event, it is not clear that the city even raised the question of "waiver" in its opposition to Brown's request for attorney's fees submitted to the full commission. See *Massachusetts Elec. Co.* v. *Massachusetts Commn. Against Discrimination*, 375 Mass. 160, 172 (1978).

[28]The full commission proceeded below, and the parties proceed on appeal, on the theory that the principles set out in *Hensley*, which involved awards of attorney's fees under 42 U.S.C. § 1988, have application in the present case. For purposes of our review, we assume that those principles have application. See *Fedele* v. *School Comm. of Westwood*, 412 Mass. 110, 117 (1992); *Walker* v. *Georgetown Hous. Authy.*, 424 Mass. 671, 677 (1997).

Court, in August, 1987, nor the Supreme Judicial Court, in February, 1989, ruled on the merits of Brown's discrimination claim. Rather, those proceedings focused on the manner in which the MCAD processed, reviewed, and adjudicated Brown's complaint. As a result of the 1990 rehearing, the hearing commissioner found in favor of Brown, and the decision was affirmed by the full commission which then, concluding that Brown was a prevailing complainant, issued an award for fees and costs.

Viewing the proceedings in their entirety, we think that the MCAD, in fashioning its award, properly considered the legal fees incurred by Brown between 1980 and March, 1989. It would not be reasonable to exclude from consideration the efforts of counsel made during that time frame. Those efforts, which included the gathering and presentation of evidence of liability, and legal advocacy in support of the findings reached by the MCAD, served as a foundation for efforts undertaken at the second hearing some ten years later. As a result of counsel's initial work and follow-up efforts in 1990, Brown was in the end successful.[29] As with the imposition of interest on the award of damages, the provision for interest on the award of attorney's

[29]We perceive nothing in *Hensley* v. *Eckerhart, supra*, that would preclude the award ordered by the full commission. In *Hensley*, the Court held that the extent of a plaintiff's success is a crucial factor in determining the proper amount of attorney's fees under 42 U.S.C. § 1988. The Court explained: "Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." 461 U.S. at 440. See *Texas State Teachers Assn.* v. *Garland Indep. Sch. Dist.*, 489 U.S. 782, 791-793 (1989); *Farrar* v. *Hobby*, 506 U.S. 103, 109-116 (1992).

Here, the record indicates that the facts and legal theories asserted by Brown in 1990 were, in large part, a reiteration of the facts and theories set forth in the first MCAD hearing. (The full commission noted that Brown's claim of harassment was dismissed by the MCAD early on and was not litigated by Brown's attorneys at any stage of the MCAD proceedings.) As we have indicated, Brown's claim of discrimination based on his race and color was relitigated due to procedural errors committed by the MCAD.

The city does not otherwise challenge the full commission's computation of the award of attorney's fees, except for a one-sentence assertion (without citation to authority) that it was unreasonable for the commission to enhance the

fees should be struck from the decision of the full commission. See *Onofrio* v. *Department of Mental Health,* 411 Mass. at 658-660; *Boston* v. *Massachusetts Commn. Against Discrimination,* 39 Mass. App. Ct. at 245. Compare and contrast *Foley* v. *Lowell,* 948 F.2d 10, 21-22 (1st Cir. 1991).

7. *Conclusion.* The judgment of the Superior Court is modified to require that the interest fee components of the awards for damages and attorney's fees be stricken from the MCAD order. As so modified, the judgment is affirmed.

*So ordered.*

---

fee by twenty-five percent. See *Fontaine* v. *Ebtec Corp.,* 415 Mass. at 326, indicating that fee enhancement is not favored "in a simple discrimination case." That contention does not constitute appellate argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).