Gants, J.
On September 17, 1999, after 2 V2 weeks of trial, the jury rendered a special verdict finding that the defendant, the Massachusetts Bay Transportation Authority (“MBTA”), had (1) discriminated against the plaintiff, Hiram Clifton (“Clifton”), in the conditions of his employment because of his race by subjecting him to a hostile work environment at some time during the period between October 20, 1992 and February 22, 1994, and (2) taken adverse employment action against him either because he expressed his opposition to a discriminatory practice internally with the MBTA or because he filed complaints with the Massachusetts Commission Against Discrimination (“MCAD”) and the Equal Employment Opportunity Commission (“EEOC”). The jury awarded Clifton $500,000 in emotional distress damages and another $5,000,000 in punitive damages, for a total damage award of $5,500,000.
The MBTA now moves for judgment notwithstanding the verdict, for a new trial, for remittitur of the *318 emotional distress and punitive damage awards, for a hearing regarding jury bias, and to alter the judgment to eliminate the award of any interest. Clifton moves to alter the judgment to include prejudgment interest on the punitive damage portion of the award. Clifton also moves for the award of reasonable attorney’s fees pursuant to G.L.c. 151B. §9. I will consider each motion in turn.
I. Defendant’s Motion for Judgment Notwithstanding the Verdict
The standard of review in evaluating the defendant’s motion for judgment notwithstanding the verdict (“JNOV”) under Mass.R.Civ.P. 50(b) was set forth by the Supreme Judicial Court in Cambridgeport Savings Bank v. Boersner:
In considering a motion for judgment notwithstanding the verdict, “the judge’s task, ‘taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.’ ” Tosti v. Ayik, 394 Mass. 482, 494, 476 N.E.2d 928 (1985), quoting Rabel v. Hayden, Harding & Buchanan, Inc., 15 Mass.App.Ct. 252, 254, 444 N.E.2d 1306 (1983). The court will consider whether “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn” in favor of the non-moving party. Poirier v. Plymouth, 374 Mass. 206, 212, 372 N.E.2d 212 (1978), quoting Raunela v. Hertz Corp., 361 Mass. 341, 343, 280 N.E.2d 179 (1972). “The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 706-07 n. 3, 563 N.E.2d 188 (1990), quoting McNamara v. Honeyman, 406 Mass. 43, 45-46, 546 N.E.2d 139 (1989).
413 Mass. 432, 438 (1992).
All agree that, to establish a hostile work environ-mentrace discrimination claim under G.L.c. 151B, the jury must find both that Clifton’s work environment was hostile for all or part of the relevant period — October 20, 1992 to February 22, 1994 — and that the MBTA committed at least one act of race discrimination during this time period that substantially contributed to the creation or continuation of that hostile work environment. The MBTA contends that the evidence was insufficient as a matter of law to permit this finding. Viewing the evidence in the light most favorable to Clifton, as is required in considering JNOV motions, this Court disagrees.
Clifton joined the MBTA as a laborer in 1983, and became a trackman ten months later in the MBTA’s Engineering and Maintenance Department in Charles-town (“E&M”). In 1986, he was selected to be a “rated in foreman” at the rail shop in E&M, becoming the first African-American ever to be made a foreman in Charlestown.
The evidence supports the finding that some of Clifton’s superiors and colleagues at the MBTA never forgave him for rising to that level on what they perceived to be their turf. Clifton testified that, right after he was chosen as foreman, the general foreman at E&M, Philip Chisholm, told Robert Rooney, then the supervisor for the entire E&M yard, that Rooney must be a “nigger-lover” to have given the job to Clifton. Chisholm allegedly later told Clifton that they had made bets that he would not last at his new job.
According to Clifton, from the time he became a foreman until 1988. he worked in a “battle zone” at the E&M yard. Chisholm and others shot bottle rockets at him, turned the lights off when he used the bathroom, shot water at him through fire hoses, dropped firecrackers near him, set water boobytraps that would fall on him when he opened his office door, and spraypainted the words “fagbait” and “Sanford and Sons” on his locker. Clifton complained to Rooney, but Rooney simply told him that he was a “rat” to complain about it and that the guys were just joking. No discipline was ever taken for the harassment. Indeed, Rooney himself began to join in the harassment, calling Clifton “Roxbury mayor,” “fucking banana,” and “Sanford,” and referring to Clifton and another black employee as “ding and dong.”
According to Clifton, by 1988, he had to escape from the harassment, even though he enjoyed the work in the rail shop, and received a transfer to the job of yard foreman in commuter rail. Rooney remained his boss and told him that, although he had transferred, he had not gotten away. In fact, Rooney remained his boss until Rooney’s retirement in May 1993, and continued to harass him, call him demeaning names, and affirmatively undercut his authority until that time.
The racial harassment of Clifton continued in this new position and the other foreman positions that followed, albeit less in the form of childish pranks and more in the form of unfairly enforcing rules upon him that were not applied to any other supervisor in a comparable position. For instance:
—When Clifton transferred to become foreman of a crew landscaping the Southwest Corridor, others in his position were given a tool bungalow near the worksite to store equipment. Clifton was not given a tool bungalow and had to store tools at his home. Yet, when he went home to retrieve these tools, he was disciplined by Rooney and another superior, Paul Pellegrini, for leaving his crew without permission.
—Clifton was the only foreman who was given a fixed work schedule, and he was disciplined when he failed to meet that schedule, even when meeting it was impractical under the circumstances.
*319 —All other crews were given a fifteen-minute coffee break in the morning: Clifton’s crew was limited to ten minutes.
—In December 1992, Rooney told him that he wanted Clifton to call him every time Clifton came and went anywhere. No one else had to do this. When Clifton called Rooney in compliance with this direction, Rooney was never available to answer the telephone.
The rules regarding the filling of vacancies kept changing, each time to Clifton's detriment. In November 1991, when the general foreman called in sick, Clifton was the next most senior foreman and was supposed to be the one to fill the vacancy. Rooney, however, chose another foreman junior to Clifton to fill the vacancy, claiming that he was going to rotate the position with different foremen. When Chisholm assumed responsibility for filling vacancies in the summer of 1993, he initially went to a seniority system when another white foreman was more senior than Clifton, but departed from seniority when Clifton was the senior man, claiming he based his decision on the greater experience of the junior man. In October 1994, the MBTA eliminated one TC general foreman position — the one in Charlestown, which was the job that Clifton happened to hold.
In the fall of 1992, Chisholm took a photograph of a black woman that resembled Clifton’s wife, placed it on a flyer that indicated her availability for sexual services, and gave a telephone number that was Clifton’s beeper number. Clifton ripped up these flyers when he saw them, but Chisholm succeeded in faxing at least one to Richard Leonard, who at that time was Division Chief of E&M. Clifton later got a dozen telephone messages on his beeper in response to this flyer.
In February 1993, Rooney ordered Clifton into Rooney’s pick-up truck, then placed it hard into reverse, and backed it into another truck, injuring Clifton. When Clifton returned to work after nine weeks on injured leave, Rooney ordered him to work on a dump truck despite orders from Clifton’s doctor that he should not perform that duty because of the back and neck injuries he sustained from the truck accident.
In August 1993, someone placed on the bulletin board of the Rail Shop in Charlestown a racist staff application purporting to be from Jesse Jackson. Clifton showed this flyer to Chisholm, but no attempt was ever made to identify and punish those who wrote or posted it.
In addition, there was evidence presented of discriminatory conduct directed against other black employees of the MBTA that was committed by MBTA supervisors or tolerated by them which Clifton learned of and reasonably made him find his work environment to be hostile to him as a black man.[1] For instance, Fuad Akbar, another black employee in E&M, told Clifton in 1993 that Paul Pellegrini, a senior manager at the MBTA, had said in Akbar’s presence that it was “only a matter of time before he fired those two niggers,” referring to Clifton and Akbar. Akbar told Clifton that Pellegrini sometimes called him “colored boy,” and had passed over him when it was his turn to be TC foreman.
Clifton initially complained about these acts to his immediate superiors, who did nothing to stop them. In January 1990, he brought his complaints to the MBTA’s Equal Employment Opportunity (“EEO”) office. The EEO officer asked him to keep a written record of the discrimination he was facing but ultimately did nothing to investigate the allegations or end the discrimination. Later in 1990, Clifton filed the first of what became a series of internal EEO complaints. The EEO failed to follow its written policies with respect to mediating such complaints, investigating them, and making written findings of fact with regard to them. Finally, in April 1993, Clifton filed the first of two discrimination complaints with the MCAD. At least one senior MBTA manager was so irked by Clifton’s filing of these internal and external complaints of discrimination that he told Clifton that he would consider him for promotion to another supervisory job only if Clifton stopped filing complaints.
In addition, Clifton presented other evidence about alleged harassment he suffered in and after 1992 concerning work disputes where Clifton believed he was treated unfairly. For instance, he was disciplined in October 1994 for using an MBTA fax machine to fax documents to the EEO office, with copies to his attorney. While the MBTA presented evidence supporting its view that these disputes focused on legitimate concerns about Clifton’s conduct and had no relationship to Clifton’s race or his complaints of discrimination, the jury could infer, given the history and context of the MBTA’s relationship with Clifton, that they had a forbidden ulterior motive.
In summation, there was sufficient evidence to support the jury’s finding that the cumulative effect of the MBTA’s conduct created a hostile work environment as a result of Clifton’s race and the complaints he made about race discrimination, that this hostile work environment existed during the relevant period within the statute of limitations (between October 20, 1992 and February 22, 1994), and that there was at least one act of discrimination that the MBTA committed during this relevant time period that contributed to the continuation of a hostile work environment. There was also sufficient evidence to support the jury’s finding that the MBTA took adverse action against Clifton in retaliation for his legally-protected challenge to discriminatory practices.
The MBTA’s strongest argument in support of its JNOV motion is that this Court must adopt, with respect to Massachusetts G.L.c. 15IB claims, the federal standard for continuing violations in discrim *320 ination cases set forth in Provencher v. CVS Pharmacy, Division of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998). In Provencher, the First Circuit declared, “Even where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place.” Id. See also Sabree v. United Brotherhood of Carpenters and Joiners, Local 33, 921 F.2d 396, 401-02 (1st Cir. 1990). Under this federal standard, the determination as to whether Clifton suffered hostile environment race discrimination must be based solely on acts of discrimination allegedly committed between October 20, 1992 and February 22, 1994. The earlier acts would be barred from being considered as part of the continuing violation because Clifton knew before October 20, 1992 that he was being unlawfully discriminated against by the MBTA. As a result, this Court would need to consider whether the acts of discrimination alleged during this 16-month time period, standing alone, are sufficient to support a finding of hostile environment race discrimination.
This federal standard was premised on the First Circuit’s understanding that the rationale behind the continuing violation doctrine was “to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred.” Provencher v. CVS Pharmacy, Division of Melville Corp., 145 3d at 15 quoting Speer v. Rand McNally & Co., 123 F.3d 6 58, 663 (7th Cir. 1997). The consequence of this interpretation of the continuing violation doctrine is that, once a victim knows he is being discriminated against, the six-month limitations clock starts running, and he will not be able to complain about this conduct (even if it continues) if he waits longer than that to file a complaint with the MCAD. Indeed, the First Circuit has reasoned “that a knowing plaintiff has an obligation to file promptly or lose his claim.” Provencher v. CVS Pharmacy, Division of Melville Corp., 145 F.3d at 14-15.
This Court does not believe that the Supreme Judicial Court will adopt this federal rule in interpreting Massachusetts’ continuing violation doctrine in hostile environment race discrimination cases. See Local 1037 v. Massachusetts Commission Against Discrimination, 406 Mass. 515, 521 n. 7 (1990) (the Supreme Judicial Court may consider analogous federal discrimination statutes for purposes of interpretation, but it is not bound by interpretations of the federal statute in construing our state statute).
Hostile environment cases are more analogous to corrosion than to explosion. This form of discrimination results from the cumulation of many acts and failures to act, some too small to complain about in isolation, that viewed in their totality create a hostile work environment. See Ruffino v. State Street Bank and Trust Company, 908 F. Supp. 1019, 1038 (D.Mass. 1995) (“hostile environment discrimmation typically is not confined to one act, directed at one individual, one time; rather, it is a composite of workplace action and inaction”). Under the federal standard, if a plaintiff does not file with the MCAD within six months of his first realizing that the totality of this conduct has reached the level of creating a hostile work environment, he loses the ability to allege this misconduct. If the misconduct continues and he files a racial discrimination claim alleging a hostile work environment, the scope of the allegations would be limited to those that occurred within the past six months, even if this misconduct, by itself, is insufficient to support a hostile environment claim. Consequently, the federal standard would not permit the MCAD or the court to consider the totality of continuing conduct in determining whether the plaintiff has suffered discrimination and in fashioning a remedy for that unlawful discrimination.
In addition, the federal standard provides a strong incentive for a victim of race harassment to bring his claim when he first realizes that he has been discriminated against. If he waits six months to see if the harassment will stop, or to work with his employer to stop it, or to learn whether the harassment will deteriorate from bad to intolerable, he will lose his ability to allege the earlier misconduct. This is not fair to the victimized employee, because it forces him prematurely to choose litigation as his remedy. Nor is it sensible for the responsible employer who wants to resolve any harassment allegations short of litigation.
As a result, the federal standard is not in keeping with the purpose and spirit of Massachusetts’ continuing violation doctrine, which is to permit the MCAD or the court “to remedy ongoing discriminatory policies.” Local 1037 v. Massachusetts Commission Against Discrimination, 406 Mass. at 520, quoting Rock v. Massachusetts Commission Against Discrimination, 384 Mass. 198, 207 (1981). That purpose cannot be accomplished unless the factfinder is permitted to examine continuing conduct in its totality and not be limited to the portion of the continuing conduct that occurred in the six months before the MCAD filing. See Local 1037 v. Massachusetts Commission Against Discrimination, 406 Mass. at 521 n. 7 (declining to follow the United States Supreme Court’s reasoning regarding continuing violations because it was “unduly restrictive of an administrative agency's ability to punish discriminatory acts”).[2]
For the reasons detailed above, the MBTA’s motion for JNOV is DENIED.
II. Defendant’s Motion for New Trial or Remittitur
In evaluating the MBTA’s motion for a new trial in this case, I am mindful of the Supreme Judicial Court’s admonition to trial judges in Turnpike Motors, Inc. v. Newbury Group, Inc.:
*321 The grant or denial of a motion for “a new trial on the ground that the verdict is against the weight of the evidence rests in the discretion of the judge.” Robertson v. Gaston Snow & Ely Bartlett. 404 Mass. 515, 520, 536 N.E.2d 344, cert. denied, 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989). quoting Bergdoll v. Suprynowicz, 359 Mass. 173, 175, 268 N.E.2d 362 (1971). The judge, however, “should not decide the case as if sitting without a jury; rather, the judge should only set aside the verdict if satisfied that the jury ‘failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.’ ” Robertson, supra, quoting Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 60, 80 N.E.2d 16 (1948). Moreover, a judge should exercise this discretion only when the verdict “is so greatly against the weight of the evidence as to induce in his mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice.” Scannell v. Boston Elevated Ry., 208 Mass. 513, 514, 94 N.E. 696 (1911).
413 Mass. 119, 127 (1992).
I begin my discussion of this motion by declaring that I have the utmost respect for the jury that considered this case. They paid careful attention to the evidence, asked thoughtful questions of the witnesses, and devoted a great deal of time to their deliberations.[3] I have no reason to think that anything they did was the “product of bias, misapprehension or prejudice,” Scannell v. Boston Elevated Ry., 208 Mass. at 514, or that they “failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.” Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. at 520.
A. Motion for New Trial as to Liability
In deciding the issue of liability — whether the MBTA discriminated against Clifton on the basis of his race and whether it retaliated against him for his complaints of race discrimination — the jury’s task was to examine the conflicting evidence of what happened and why it happened, and determine how the MBTA acted towards Clifton and why it acted that way towards him. In performing this task, there was sufficient evidence for the jury to find in favor of Clifton and I see nothing unfair about that finding.
B. Motion for New Trial as to Damages
1. Compensatory Damages
In deciding the issue of compensatory damages, the jury needed to put a dollar figure on the emotional distress that Clifton suffered as a result of the discrimination and retaliation he suffered over what the jury could reasonably have found was many years. In my instructions to the jury, I told them that their object, if they found liability, was to restore Clifton to the position he would have been in had the wrong not occurred. I acknowledged that there was no special formula to assess a plaintiff s emotional distress damages in these circumstances, that they were to assess what was fair, adequate, and just to compensate Clifton for any injuries that were more likely than not caused by the MBTA’s alleged discrimination, and that, in doing so. they had to be guided by their common sense and conscience. The jury, after considering the evidence and these instructions, found emotional distress damages of $500,000, which the MBTA claims is far too large to constitute justice in this case. I disagree. .
As with a motion for a new trial on the issue of liability, a new trial ought not to be ordered on the issue of actual damages simply because the judge “himself would have assessed the damages in a different amount.” Solimene v. B. Grauel & Co., KG, 399 Mass. 790, 803 (1987), quoting Bartley v. Phillips, 317 Mass. 35, 40 (1944). See also Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 292 (1993) (a new trial should not be ordered on the grounds that the damage award was excessive unless “it appears to the judicial conscience and judgment that otherwise a miscarriage of justice will result”). When, as here, there is no measurable economic loss, a court should even be more wary of interfering with a jury’s finding. See Labonte v. Hutchins & Wheeler, 424 Mass. 813, 825 (1997) (recognizing that claims for emotional distress damages are inherently difficult to evaluate); Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987). A finding of discrimination alone is sufficient to support an award of emotional distress damages, without any need to establish physical injury or psychiatric consultation. Labonte v. Hutchins & Wheeler, 424 Mass. at 824, citing Buckley Nursing Home, Inc. v. Massachusetts Commission Against Discrimination, 20 Mass.App.Ct. 172, 182 (1985), and Bournewood Hospital, Inc. v. Massachusetts Commission Against Discrimination, 371 Mass. 303, 317 (1976). Since a judge is no better able than a jury to determine what amount of money will compensate a man for being humiliated and harassed over many years because of the color of his skin, a judge should be reluctant to find the amount decided by the jury to be excessive. See Labonte v. Hutchins & Wheeler, 424 Mass. at 825 (citing with approval the acknowledgment by another court that emotional distress awards have traditionally been left to the jury because there is little in legal authority to guide a court in determining when an emotional distress award is excessive). All that a judge knows which the jury does not is what other courts have seen fit to award.
Evaluating a damage award in terms of what other juries and judges have done is of limited value, both because each case presents different facts and because the outcome of the analysis depends on which of the hundreds of comparable cases are brought to the court’s attention. See Labonte v. Hutchins & Wheeler, 424 Mass. at 826 n. 17 (emphasizing that the *322 court did not rely on damage awards in comparable cases to arrive at its conclusion, but simply to buttress it). From my own admittedly unscientific review, there is no question that the award here is on the high end of emotional distress awards and higher than the vast majority of such awards in discrimination cases. Yet, it does not stand alone. As the plaintiff has noted, other juries have awarded $500,000 in emotional distress damages in discrimination cases, and other courts have upheld such verdicts. See Brocklehurst v. PPG Industries, Inc., 865 F.Sup. 1253, 1266 (E.D.Mich. 1994) (age discrimination); Jenkins v. Southeastern Michigan Chapter, American Red Cross, 141 Mich.App. 785, 369 N.W.2d 223, 230 (1985) (race discrimination). In Massachusetts, the MCAD in at least four cases identified by the plaintiff has awarded amounts ranging from $250,000 to $335,000 for emotional distress, and the three cases that were reviewed by the Superior Court survived that challenge. See Westinghouse Electric Supply Corporation v. MCAD, 9 Mass. L. Rptr. No. 29, 661, 666 (May 17, 1999) ($250,000); Abramian v. President and Fellows of Harvard College, 9 Mass. L. Rptr. No. 25, 556, 562 (April 19, 1999) ($250,000); Walsh v. Carney Hospital Corporation, 8 Mass. L. Rptr. No. 26, 574, 578 (August 31, 1998) ($335,000); Said v. Northeast Security, 18 MLDR 255 (1996) ($300,000).
While the award for emotional distress is unusually high relative to other cases, the jury was entitled to find that the indignity suffered by Clifton, both in its intensity and duration, was also unusually high. The jury could have found that Clifton was haunted by acts of discrimination and retaliation for at least eight years. He sought psychological help for the problems caused by his discrimination, and was humiliated for doing that by one of his MBTA superiors. There was evidence that Clifton became depressed, angry, fearful, and ultimately beaten down as a result of the discrimination he suffered. There was evidence that Clifton had cause to feel beaten down, because the discrimination continued year after year in various forms and the MBTA consistently failed to act on his complaints to put an end to the practice. In short, the jury reasonably could have found that for at least eight years Clifton was tormented by colleagues and superiors who wanted him to fail because of the color of his skin, and that Clifton’s emotional life was transformed not only by suffering this harassment but by endeavoring to defeat it.
This case may be sharply distinguished from Labonte v. Hutchins & Wheeler, 424 Mass. at 826, where the Supreme Judicial Court in a handicapped discrimination case found a jury’s award of $550,000 in emotional distress damages to be excessive. In Labonte, the plaintiff was hired as the executive director of the defendant law firm in June 1990, was diagnosed as suffering from multiple sclerosis a year later, and was terminated from the firm in January 1992 after the firm failed to make any reasonable accommodation to his disability. Id. at 814-15. As a result of his termination, the plaintiff became very depressed and sought therapy, but he was working as a consultant, taking doctoral classes, and teaching by the fall of 1993. when his depression abated. Id. at 815-16, 825. There was evidence in Labonte that the plaintiff was relieved to be freed from the stress of his law firm position and that he was “very motivated” to move on to newprojects. Id. at 825. In the instant case, the jury was entitled from the evidence to find that Clifton’s emotional distress lasted far longer, was far more painful, and was not diminished by any positive elements. Moreover, while Labonte was fired from the defendant law firm because the firm was unwilling to make any reasonable accommodation to his handicap, the discrimination against Clifton was far uglier, focusing solely on the color of his skin and the complaints he made about the race discrimination that he suffered.
For all these reasons, this Court does not find the jury’s $500,000 award for emotional distress to be excessive.
3. Punitive Damages
The Supreme Court of the United States has held that punitive damage awards must not be so grossly excessive that they violate notions of fundamental fairness and rationality inherent in the concept of due process of law under the Fourteenth Amendment. See, e.g., TXO Production v. Alliance Resources, 509 U.S. 443 (1993). While a governmental entity like the MBTA is not protected by the Fourteenth Amendment, the Supreme Judicial Court has made it clear that trial courts in Massachusetts should employ the same due process analysis to ensure that punitive damage awards against such entities are not excessive or irrational. Bain v. Springfield, 424 Mass. 758, 768 (1997).[4] I also note that the MBTA has argued that punitive damages may not be assessed here since G.L.c. 15 IB was amended to permit punitive damages only in 1990, and the jury was permitted to consider misconduct before that date in determining the amount of punitive damages. This issue was never raised at trial by the MBTA and therefore will not be considered post-trial.
The Supreme Judicial Court has declared that “three main factors should be considered in determining if a punitive damage award is excessive;
—’the degree of reprehensibility of the defendant’s conduct,’
—the ratio of the punitive damage award to the ‘actual harm inflicted on the plaintiff,’
—with a comparison of ‘the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.’ “
Labonte v. Hutchins & Wheeler, 424 Mass. at 826, quoting BMW of N. Am. v. Gore, 517 U.S. 559, 575, 580, 583 (1996). In addition, the Supreme Judicial *323 Court found that other factors identified by Justice Breyer in his concurrence in BMW of N.Am. v. Gore may also be considered in reviewing punitive damages:
—a reasonable relationship to the harm that is likely to occur from the defendant’s conduct as well as to the harm that actually has occurred;
—a reasonable relationship to the degree of reprehensibility of the defendant’s conduct;
—removal of the profit of an illegal activity and be in excess of it so that the defendant recognizes a loss;
—factoring in of the financial position of the defendant;
—factoring in of the costs of litigation and encourage plaintiffs to bring wrongdoers to trial;
—an examination whether criminal sanctions have been imposed;
—an examination whether other civil actions have been filed against the same defendant.
Labonte v. Hutchins & Wheeler, 424 Mass. at 827, citing BMW of N. Am. v. Gore. 517 U.S. at 589 (Breyer, J., concurring).
Examining the three main factors, the race discrimination found by the jury was quite reprehensible and worthy of some amount of punitive damages. The 10:1 ratio between punitive and compensatory damages, by itself, does not cross any constitutional line of unfairness, because there is no such categorical line. See BMW of N. Am. v. Gore, 517 U.S. at 580-83. However, one consideration in evaluating this ratio is whether the actual punitive damage award is reasonable in view of the relationship between the harm actually suffered by the victim and the harm that would have resulted if the tortious plan had succeeded. Id. at 580; TXO Production v. Alliance Resources, 509 U.S. at 460. In this case, there is no difference between the harm that Clifton could have suffered from the discrimination and the harm he did suffer. This is not a case where the defendant acted dangerously but got lucky because the danger he caused produced little harm, justifying a substantial punitive damage award to deter the dangerous conduct. The third main factor does not apply here, because there is no criminal or civil penalty that realistically could properly be imposed for this conduct.
Looking to some of the other factors raised by Justice Breyer, the MBTA is not a for-profit organization, so the award of punitive damages cannot be justified to eliminate any financial benefit the MBTA may have earned from race discrimination. Nor are punitive damages needed to give plaintiffs the financial incentive to bring race discrimination actions of this type under G.L.c. 151B, since the statute permits the collection of back pay, front pay, and emotional distress damages, along with attorneys fees.
I recognize that, when one punishes a public entity with punitive damages, one is effectively punishing the taxpayers, who played no role in the misconduct. City of Newport v. Pact Concerts, Inc., 101 S.Ct. 2748, 2759 (1981). Since the Legislature has specifically chosen to waive sovereign immunity and permit public entities like the MBTA to be subject to punitive damages in discrimination cases under G.L.c. 151B, see Bain v. Springfield, 424 Mass. at 762-64, I do not believe it is appropriate for a court to find punitive damages against a public entity excessive solely because the incidence of that punishment will be on the innocent taxpayer. If that were the result the Legislature intended, it would not have waived sovereign immunity to permit such damage awards. However, it is appropriate to consider that the defendant is a public entity in evaluating the size of the award, since the financial position and profitability of the defendant may properly be considered. The MBTA, by its nature, has no retained profits and no profit motive for its misconduct.
For punitive damages against such a public entity to be rational and fundamentally fair in the circumstances of this case, the conduct must be reprehensible and the amount of damages must be designed to deter the public entity from engaging in similar conduct. See City of Newport v. Fact Concerts, Inc., 101 S.Ct. at 2759 (punitive damages by definition are intended “to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct”). The conduct found by the jury was indeed reprehensible and a substantial amount of punitive damages is indeed appropriate to deter future misconduct, but I find that, considering all of the relevant factors, the amount of punitive damages was excessive. Punitive damages in the amount of $500,000 are sufficient to deter such behavior in the future. When combined with the $500,000 compensatory damage award, it will produce a total damage award of $1 million against the MBTA for its acts of discrimination and retaliation, without even considering the attorneys fees to which the plaintiff is entitled under G.L.c. 151B. This amount is certainly large enough to send a loud and clear message to the MBTA that it must put an end to any legacy of discrimination that still pervades that organization.
I recognize that one may question the sincerity of my earlier pronouncement of admiration for this jury in view of my decision to reduce by 90 percent the amount of punitive damages awarded by that same jury. The fact of the matter is that, while deference is owed to every jury verdict, courts have traditionally given far less deference to the award of punitive damages than to the award of compensatory damages for emotional distress. Compare Labonte v. Hutchins & Wheeler, 424 Mass. at 824 (only practical test for determining whether emotional distress awards are *324 excessive is if it “so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption”), quoting Mather v. Griffin Hosp., 207 Conn. 125, 139 (1988), with Labonte v. Hutchins & Wheeler, 424 Mass. at 826 (common law and constitutional principles mandate that courts “review the amount [of a punitive damage award] to ensure that it is reasonable and not simply a criminal penalty”).
Lesser deference is appropriate because a jury is generally asked, as it was here, to decide the issue of punitive damages with little guidance and inadequate information. Without objection from any party, this jury was given the following instruction regarding punitive damages:
If you find that the MBTA committed race discrimination or retaliation against Mr. Clifton, you may consider, in your discretion, whether punitive damages are warranted. Punitive damages differ from compensatory damages. Unlike compensatory damages, which compensate the victim for the harm he suffered as a result of the defendant’s misconduct, the purpose of punitive damages is to punish the wrongdoer for intentional misconduct and deter future misconduct. In determining whether any award of punitive damages is appropriate and, if so, the amount of such an award, you may consider:
1. The character, nature, and duration of the defendant’s conduct;
2. The amount of money needed, in view of the defendant’s financial means, to punish the defendant’s conduct and deter any future acts of misconduct;
3. The actual harm suffered by the plaintiff; and
4. The magnitude of any potential harm to other victims if similar future behavior is not deterred.
If you do award punitive damages, you should fix the amount by using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in the case.
Neither side sought to bifurcate the trial so that additional evidence could be admitted relevant solely to the issue of punitive damages. As a result, while the jury heard a great deal of evidence about the MBTA’s conduct towards this defendant and the harm he suffered from that conduct, it heard virtually nothing about its conduct towards other employees and literally nothing about its current policies or practices towards minority employees. Nor did it learn anything about the MBTA’s financial position, apart from its annual gross revenues in fiscal year 1998, which was admitted by stipulation. In short, since the parties did not offer evidence either as to the MBTA’s financial posture or the present need for deterrence, the jury was not well-positioned to make an informed decision as to the amount of money needed to deter such misconduct in the future. The greater scrutiny given to punitive damage awards implicitly acknowledges that juries are given less guidance and information to decide the issue of punitive damages than to decide the issues of liability and compensatory damages.
Therefore, this Court ALLOWS the MBTA’s motion for a remittitur, and remits the punitive damage award from $5 million to $500,000. The plaintiff has 30 days from the date of this Order to inform the Court in writing as to whether he accepts the reduced amount of damages. If he accepts this reduced damage award, a new judgment shall be issued reflecting the reduction and the MBTA’s motion for a new trial shall be DENIED. If he rejects this reduced damage award, then the MBTA’s motion for a new trial as to punitive damages only shall be ALLOWED.[5]
III. Defendant’s Motion for Hearing Regarding Potential Jury Bias
The MBTA asks this Court to conduct an in camera interview of juror Monica Dean to determine whether Ms. Dean worked for State Senator Dianne Wilkerson and became aware, through the course of her employment, of either this lawsuit or issues that were raised with Senator Wilkerson by the Concerned Minority Employees of the MBTA. The MBTA’s motion is DENIED.
During jury selection, Ms. Dean raised her hand to a number of questions asked of the entire venire by the Court and therefore was brought to sidebar when her name was called. At sidebar, she said she was “an employee of the Senate, but I don’t believe that would affect it,” referring to her ability to be fair.[6] The Court specifically asked her, “Is there anything about the fact that you work for the Senate that would affect your ability to be fair and impartial here?” She responded, “No.” The Court then directed that she take a seat in the jury box. Immediately thereafter, the MBTA’s attorneys, having referred to their notes of the questions asked of the venire, informed the Court that Ms. Dean had also answered affirmatively the question, “Have any of you read any newspaper articles or heard any press accounts, or listened to any radio or television news, that related in any way to matters involving the MBTA and matters involving the employees at the MBTA, or any issues that concerned the employees of the MBTA?”[7] The Court then called Ms. Dean back to sidebar and the following colloquy ensued:
The Court: One of our better notetakers noted that you had answered “yes” to the question of having read something about the MBTA involving matters of race or regarding their employees. Do you recall raising your hand to that question?
Ms. Dean: I raised my hand because I remember I read articles in the Globe. A couple months ago, an incident occurred at a “T” station. I was referring to that.
The Court: What do you recall of that incident?
*325 Ms. Dean: That two individuals were getting on a bus, and got into a conflict, altercation with MBTA workers. I think that was the nature of the event.
The Court: Okay. Was there anything about that that would affect your ability to be fair and impartial in this case?
Ms. Dean: No.
The Court: Is there anything that you’ve heard about the MBTA that would affect your ability to be fair and impartial?
Ms. Dean: No.
Apart from following up on Ms. Dean’s affirmative answer, there was no request by counsel that Ms. Dean be asked any further questions.[8]
The MBTA argues that Senator Wilkerson and other members of the Black Legislative Caucus had intimate knowledge of plaintiffs claims of discrimination and advocated on his behalf. It now maintains that Ms. Dean should have been asked in voir dire whether she worked with Senator Wilkerson and obtained any knowledge of Clifton’s allegations through that work. Since she was not asked at voir dire, it seeks to ask her those questions now.
For reasons too obvious to detail, post-verdict interviews of jurors are permitted only in extraordinary circumstances. See United States v. Kepreos, 759 F.2d 961, 967 (1st Cir. 1985). The circumstances described here do not justify so extraordinary a procedure, for at least four reasons. First, the MBTA never asked the Court to explore more fully with the prospective juror what constituent services she handled for the State Senate and which Senators she worked closely with, even though it knew both that she worked for the State Senate and that Senator Wilkerson and the Black Legislative Caucus had advocated on behalf of Clifton and other minority MBTA employees. “[A]s a general matter, the pre-empanelment voir dire of prospective jurors, rather than a postverdict Fidler hearing, is the appropriate forum for investigating extraneous knowledge brought to the case by a juror.” Commonwealth v. Hunt, 392 Mass. 28, 42 n. 18 (1984). Having failed to ask for these questions before the jury was sworn, the MBTA has waived its right to ask them now.
Second, there is no evidence that Ms. Dean in any way intended to deceive the Court by not identifying herself as working for Senator Wilkerson. According to an affidavit submitted by Senator Wilkerson, Ms. Dean was employed by the Massachusetts Senate and assigned to Senator Wilkerson’s office. Ms. Dean accurately told the Court that she was a State Senate employee; no one asked her which Senator she was assigned to at the State Senate.
Third, there is no evidence that Ms. Dean had any prior knowledge of this case or its allegations. According to the MBTA’s motion, in the summer of 1996, Senator Wilkerson, having earlier met with Clifton, called on the House Post-Audit and Oversight Committee to investigate the issues that Clifton raised. The MBTA in its motion identifies nothing that Senator Wilkerson or other members of the Black Legislative Caucus did after the summer of 1996 with regard to Clifton’s allegations. Ms. Dean, however, according to the undisputed assertions in Senator Wilkerson's affidavit, did not begin working with Senator Wilkerson until the summer of 1997, when she was assigned there as a summer intern. Consequently, it is not surprising that Senator Wilkerson attested, “To my knowledge Ms. Dean had absolutely no connection and absolutely no knowledge of my work on behalf of [Concerned Minority Employees] members or employees of the MBTA.”
Fourth, there is no evidence that Ms. Dean engaged in any misconduct as a juror. Indeed, Senator Wilkerson stated in her affidavit, “Neither I nor anyone on my staff was aware that Ms. Dean was sitting on the Clifton v. MBTA case until she returned to the office the afternoon the jury reached a verdict.” This is precisely how the Court told the jurors to conduct themselves with friends and co-workers, and demonstrates Ms. Dean’s adherence to the Court’s instructions.
In short, there is no evidence that Ms. Dean did anything wrong or knew more about the case than she advised the Court during empanelment. As a result, it would be wholly inappropriate for this Court to order the extraordinary step of calling her in for an in camera interview.
IV. Defendant’s Motion to Alter Judgment to Strike the Recovery of Interest on Compensatory Damages
The MBTA moves to eliminate from the judgment the assessment of any interest on compensatory damages, both pre-judgment and post-judgment. The MBTA’s motion is ALLOWED.
Interest may not be assessed against the Commonwealth or any of its instrumentalities “in the absence of express statutory authorization.” Boston v. Massachusetts Commission Against Discrimination, 39 Mass.App.Ct. 234, 245 (1995). See also Onofrio v. Department of Mental Health, 411 Mass. 657, 658 (1992) (interest not recoverable absent statutory authority); Gurley v. Commonwealth, 363 Mass. 595, 600 (1973); City of Salem v. Massachusetts Commission Against Discrimination, 44 Mass.App.Ct. 627, 646-47 (1998).
There is no dispute that the MBTA is an instrumentality of the Commonwealth. Nor is there any dispute that G.L.c. 15 IB is silent on the issue of awarding interest. See G.L.c. 15IB, §9 (authorizing the award of actual and punitive damages, attorneys fees, and costs, but stating nothing about interest on any award). Nor is there any doubt that there is controlling precedent that interest may not be assessed on a G.L.c. 15 IB damage award against any instrumental *326 ity of the Commonwealth. City of Salem v. Massachusetts Commission Against Discrimination, 44 Mass.App.Ct. at 646; Boston v. Massachusetts Commission Against Discrimination, 39 Mass.App.Ct. at 245 (“there is no express statutory authorization for the payment of interest on awards under G.L.c. 151B against the Commonwealth or its instrumentalities”).
Clifton claims, however, that the MBTA stands in a unique statutory posture among instrumentalities of the Commonwealth in that G.L.c. 161A. §21 provides that the MBTA “shall be liable for the acts and negligence of the directors and of the servants and employees of the [MBTA] in the management and operation of the [MBTA] ... to the same extent as though the [MBTA] were a street railway company, but the directors shall not be personally liable except for malfeasence in office.” According to Clifton, this provision strips the MBTA of all sovereign immunity and places it in precisely the same position in civil actions as a private street railway company, which must pay interest on damage awards under G.L.c. 231, §6B. Clifton also points out that the Supreme Judicial Court, in Mirageas v. MBTA, 391 Mass. 815 (1984), upheld the payment of interest as part of a damage award against the MBTA in a common law tort action that preceded passage of the Massachusetts Tort Claims Act, G.L.c. 258.
This Court does not find that G.L.c. 161A, §21 constitutes express statutory authority for the imposition of interest on the damage award. The language relied on by Clifton simply declares that the same principles of respondeat superior that apply to a street railway company apply to the MBTA, with the express limitation on individual liability identified in the last phrase. It does not state, as Clifton contends, that sovereign immunity is waived with respect to the MBTA or that the MBTA shall be treated the same as a street railway company in all respects in all civil actions.
The language in the Massachusetts Tort Claims Act is far closer to the interpretation that Clifton seeks to impose upon the narrower language in G.L.c. 161 A, §21. The Tort Claims Act provides:
Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers shall not be liable to levy of execution on any real and personal property to satisfy judgment, and shall not be liable for interest prior to judgment or for punitive damages or for any amount in excess of one hundred thousand dollars.
G.L.c. 258, §2. Yet, even this language was found by the Supreme Judicial Court to fall short of the statutory authority needed to authorize the recovery of post-judgment interest. Onofrio v. Department of Mental Health, 411 Mass. at 658-59. Indeed, the Onofrio Court specifically rejected the plaintiffs argument in that case that the express prohibition against prejudgment interest in the Tort Claims Act implied a legislative intent to permit post-judgment interest, declaring:
Were this not a statute governing waiver of sovereign immunity, the plaintiffs argument might succeed: however, “[t]he rules of construction governing statutory waivers of sovereign immunity are stringent.” Ware v. Commonwealth, 409 Mass. 89, 91 (1991), quoting Woodbridge v. Worcester State Hosp., 384 Mass. 38, 42 (1981).
Onofrio v. Department of Mental Health, 411 Mass. at 659. If the more express language in the Tort Claims Act is deemed inadequate to permit the recovery of post-judgment interest, then certainly the far less express language in G.L.c. 161A, §21 must be inadequate to permit the recovery of pre-or post-judgment interest.
The fact that the Supreme Judicial Court in Mirageas v. MBTA has approved the payment of interest in a tort action without any more express statutory authority than G.L.c. 161A, §21 does not change my view. In Mirageas, the Court focused solely on whether interest at the new 12 percent rate was authorized under the recently amended G.L.c. 231, §6B. The MBTA in that case did not appear to challenge whether interest in any amount could be awarded, so the Court never addressed this issue. Nor is there any indication in that opinion that the Court considered the issue now raised by the MBTA before awarding the payment of interest at the 12 percent rate. See Mirageas v. MBTA, 391 Mass. at 819-21.
Consequently, this Court ALLOWS the MBTA’s motion to alter the judgment to vacate the award of any interest in this case, both pre-judgment and post-judgment.
V. Plaintiffs Motion to Alter or Amend the Judgment to Include Pre-Judgment Interest on the Entire Judgment
In allowing the MBTA’s motion to alter the judgment to vacate any award of interest, this Court is also denying Clifton’s motion to include pre-judgment interest on the entire award, including the award of punitive damages.
It should be noted, however, that there is also a separate and independent ground on which to deny Clifton’s motion for pre-judgment interest on punitive damages. No plaintiff, regardless of whether it is a private person or a governmental entity, is entitled to pre-judgment interest on punitive damages. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 717 n.9 (1990): Nardone v. Patrick Motor Sales, Inc., 46 Mass.App.Ct. 452, 454 (1999).
*327 VI. Plaintiffs Motion for the Award of Attorneys Fees
As the prevailing party, Clifton seeks attorneys fees under G.L.c. 15 IB, §9 in the amount of $247,580.94. He calculates that amount by seeking an hourly rate of $275 for the 531.02 hours devoted to this case by attorney Kevin Powers, an hourly rate of $250 for the 166.03 hours spent by attorney Robert Mantell, and an hourly rate of $200 for the 31.73 hours spent by attorney Linda Evans, plus a 25 percent lodestar enhancement based on the difficulty of the case and the quality of the representation.
In calculating an attorneys fee award under G.L.c. 15 IB, §9, this Court should consider a number of factors, including:
—how long the trial lasted;
—the difficulty of the legal and factual issues involved;
—the degree of competency demonstrated by the attorneys;
—the time and labor required;
—the amount of damages involved;
—the result obtained;
—the experience, reputation, and ability of the attorneys;
—the usual price charged for similar services by other attorneys in the same area; and
—the amount of awards in similar cases.
Fontaine v. Ebtec Corp., 415 Mass. 309, 324-25 (1993), citing Heller v. Silverbranch Const Corp., 376 Mass. 621, 629 (1978); Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979).
There can be little doubt that, in the instant case, there was a long trial, complex legal and factual issues, able and experienced trial counsel who invested a great deal of time to prepare and try the case, and, even with the remittitur, a great victory for the plaintiff. For all these reasons, a substantial attorneys fees award is amply justified. There are, however, three issues that must be resolved to determine the precise magnitude of the award: the amount of hours, the hourly rate, and the lodestar enhancement.
I have reviewed the contemporaneous time records submitted by the three attorneys. I find the hours claimed by the attorneys to be reasonable if reduced by ten percent. I make this reduction because, when the case began, there was a co-defendant, Fuad Akbar, whose case settled before the instant case went to trial. I recognize that the plaintiff is not seeking recovery for over 47 hours devoted to working on Akbar’s case, but this constitutes only about six percent of all the hours devoted to this joint prosecution. It is difficult to believe that, if this case had begun with Clifton as the only plaintiff, only 47 hours would have been saved from those actually expended. Moreover, given the absence of detail in the time records, it is impossible to determine precisely how much time would have been saved if Akbar had never been a plaintiff. While it may be easy to eliminate those time items that are identified as belonging solely to the prosecution of Akbar’s case, there are certainly many expenditures of time that may have been necessary for both plaintiffs but which would have taken less time if there had been only one plaintiff, such as depositions or telephone calls discussing the case. I do not find that this warrants a 50 percent reduction, as the defendant seeks, but it does warrant a ten percent reduction in the declared hours for each attorney.
I have also reviewed the materials submitted regarding the attorneys’ hourly billing rates. Clifton's attorneys, although part of a very small firm, seek attorneys fees equal to those charged by attorneys in the largest, most expensive law firms in the Commonwealth. Those large firms, however, represent a rather small share of the Bar in this Commonwealth, and an even smaller share of the employment Bar. The fact remains that smaller, “boutique” law firms do not generally charge the same rates as the largest firms, even when their attorneys have come from large firms, because their overhead is lower and because most of their non-corporate clients cannot afford the rates charged by the largest firms. Clifton’s attorneys also seek the hourly rates charged today by these large law firms, even though many of these hours were expended from 1993 through 1997 and would have been billed at the lower rates in effect during those years. For these reasons, I find that attorney Powers should be compensated at an hourly rate of $250 per hour, attorney Mantell at $ 175 per hour, and attorney Evans at $ 125 per hour.
The rates I have determined for each attorney are appropriate to the roles they played in this case. Attorney Powers was the only attorney who questioned witnesses at trial, the only attorney who argued to the jury, and, for all but jury selection, the only attorney who sat at counsel’s table. He was plainly lead counsel, with a role akin to a partner in a larger firm. Attorney Mantell handled much of the discovery and the legal research, but his role was more akin to a senior associate than to a partner. Attorney Evans organized materials for trial and performed some legal research; her role was closely akin to a junior associate.[9]
The hourly rates that I have allowed are in keeping with those charged by some of the finest “boutique” law firms in Boston and, indeed, many of the larger firms, albeit not for their most expensive partners. They fully take into account the high quality of the legal work performed in this case and the fair market value for such high quality work.
I do not find that a lodestar enhancement is appropriate in this case. Such an enhancement might by appropriate in a complex case where the rights sought *328 to be vindicated are important but the likely damages are modest. See Fontaine v. Ebtec Corp., 415 Mass. at 326 n. 14. In such a case, the incentive for an attorney to take the case may be too meager without some enhancement. The rights in the instant case are certainly important but the damages, even with the re-mittitur, are hardly modest, especially when supplemented by the award of attorneys fees. The award of attorneys fees in c. 15IB cases “is not designed to provide a windfall recovery of fees.” Id. at 326. In this case, given the amount of damages that remain after the remittitur and the attorneys fees awarded without any lodestar enhancement, a lodestar enhancement is not necessary to achieve the statutory purpose. See id.
In light of these considerations, this Court awards attorneys fees and related costs in the amount of $150,856.17, broken down as follows:
Attorney Powers: 477.9 hours at $250 per hour $119,475.00
Attorney Mantell: 149.4 hours at $ 175 per hour $26,145.00
Attorney Evans: 28.6 hours at $125 per hour $3,575.00
Related costs: $1,661.17[10]
ORDER
For the reasons stated above, this Court ORDERS that:
1. The Defendant’s Motion for Judgment Notwithstanding the Verdict is DENIED.
2. The Defendant’s Motion for Remittitur is ALLOWED to the extent that this Court orders a remitti-tur of the punitive damage award from $5,000,000 to $500,000, and of the total damage award from $5,500,000 to $1,000,000. The plaintiff has 30 days from the date of this Order to inform the Court in writing as to whether he accepts the reduced amount of damages. If he accepts this reduced damage award, a new judgment shall be issued reflecting the reduction and the MBTA’s Motion for a New Trial shall be DENIED. If he rejects this reduced damage award, then the MBTA’s Motion for a New Trial shall be ALLOWED as to the issue of punitive damages only, and a new trial shall be conducted on that limited issue.
3. The Defendant’s Motion for Hearing Regarding Potential Jury Bias is DENIED.
4. The Defendant’s Motion to Alter Judgment to Strike the Recovery of Interest on Compensatory Damages is ALLOWED as to both pre-judgment and post-judgment interest. The award of any interest in this case, both pre-judgment and post-judgment, is hereby VACATED.
5. The Plaintiffs Motion to Alter or Amend the Judgment to Include Pre-Judgment Interest on the Entire Judgment is DENIED.
6. Attorneys fees and related costs are awarded to the plaintiff under G.L.c. 151B, §9 in the amount of $150,856.17.

"[T]he conduct to be considered as comprising hostile environment discrimination need not all have been directed personally at the plaintiff. As a matter of settled law and common sense, a hostile environment claim requires consideration of the environment in which a plaintiff works.’’ Ruffino v. State Street Bank and Trust Co., 908 F.Supp. 1019, 1038-39 n. 34 (D.Mass 1995). At trial, this Court limited evidence of acts directed against others to those that concerned race discrimination and became known to Clifton, such that the acts themselves and the MBTA’s failure to punish anyone for those acts became part of the environment in which Clifton worked.

In view of this finding as to the law, this Court expressly does not decide whether the evidence, viewed in the light most favorable to the plaintiff, would be sufficient to support a finding of race discrimination or retaliation if the Provencher standard were to be found applicable to G.L.c. 15IB cases.

The jury was allowed to ask written questions of each witness in this case once the attorneys had completed their questioning of the witness.

The MBTA has argued that punitive damages may not be awarded against public entities. This flies right in the face of the Supreme Judicial Court's holding in Bain v. Springfield, which specifically found that punitive damages may be awarded against public entities in discrimination cases brought under G.L.c. 151B. 424 Mass. at 762-64. Since Bain is a controlling case, I need not dwell on the MBTA's arguments regarding this contention.

 At a new trial limited to the determination of punitive damages only, a far broader scope of evidence may be considered than would be admissible on the issues of liability and compensatory damages.

MBTA’s counsel has reported to the Court that Ms. Dean, in her juror questionnaire, identified her employer as the "State Senate Constituent Office.” This Court did not keep a copy of the juror's questionnaire, but counsel's memory is consistent with that of the Court.

Ms. Dean did not raise her hand to the following question, which immediately preceded the question exploring any knowledge obtained from press reports:
As you know, the defendant in this case is the MBTA. Let me ask you whether any of you have any information from any source that would in any way affect your ability to be fair and impartial with respect to any issue concerning race at the MBTA. If there is any issue involving race and the MBTA that you come into this courtroom believing or having information about which would in any way affect your ability to be fair and impartial in this case, please raise your hand.

Often during voir dire, counsel does not have much opportunity to ask the Court to make further inquiry of a juror, either because the juror never comes to sidebar or because the next juror's number is immediately called. Here, counsel had an unusually full opportunity to make such a request. Ms. Dean came to sidebar; after she left, counsel requested the Court to ask her additional questions; the Court granted that request; and Ms. Dean left her seat in the juiy box and returned to sidebar.

The MBTA argues that some of attorney Evans's work would have been more appropriately assigned to a paralegal. While this may be true as to some of the tasks, the fact remains that it takes time to delegate these tasks and the hourly rates charged by the senior paralegals able to perform them with little guidance are often equal to or only slightly below the rates charged by junior associates. Given how few of these tasks could be challenged in this regard and how many of them involved assisting attorney Powers in preparing direct and cross-examination, I do not find it unreasonable *329 that these tasks were performed by a junior attorney rather than a senior paralegal.

The MBTA argues that the expenses incurred for delivery, copying, and trial supplies should be viewed as “overhead" and not as recoverable expenses. I do not find these expenses to be part of ''overhead" — all (or nearly all) involve payments to third-party service suppliers, such as Copy Cop and Boston Bicycle, not the use of office equipment or support employees.