Michael BRATTON, Plaintiff

v.

CSX TRANSPORTATION, INC., Defendant.

Civil Action No. 07–11515–WGY.

United States District Court,
D. Massachusetts.

Nov. 19, 2008.

Helen A. Bryant, Pamela Coveney, Thomas P. Murphy, Karen O. Talley, Disability Law Center, Boston, MA, for Plaintiff.

Sandra E. Kahn, David S. Rosenthal, Nixon Peabody, LLP, Boston, MA, for Defendant.

## MEMORANDUM

YOUNG, District Judge.

## I. INTRODUCTION

After the plaintiff, Michael Bratton ("Bratton"), who has Crohn's disease, was terminated from his job as a train conductor with the defendant, CSX Transportation, Inc. ("CSX"), he brought this action claiming that he was treated differently because of a handicap in violation of Massachusetts General Laws chapter 151B, section 4(16). He sought reinstatement to his job, lost wages, compensatory and punitive damages, costs and attorney's fees.

CSX moved for summary judgment, arguing that Bratton failed to present credible evidence that he had a handicap protected by the employment discrimination statute and that he was treated differently than similarly situated non-disabled employees. *See* CSX Reply in Further Support [Doc. No. 54] at 2. On October 31, 2008, the Court granted CSX's motion for summary judgment [Doc. No. 59] and administratively closed the case. [Doc. No. 60]. This memorandum explains that decision.

### A. Procedural Posture

Bratton filed his complaint in the Massachusetts Superior Court sitting in and for the County of Middlesex on July 18, 2007. ("Compl.") [Doc. No. 4 at 10–17]. After removing the case to this Court, [Doc. No. 1], CSX, on September 11, 2007, filed a motion to dismiss for failure to state a claim, [Docs. No. 5–6], which Bratton opposed. [Doc. No. 8]. The Court heard and denied the motion on March 12, 2008.

CSX answered the complaint on April 2, 2008 [Doc. No. 14], and filed the instant motion for summary judgment on September 29, 2008, [Doc. No. 21] supported by a memorandum of law ("CSX Mem.") [Doc. No. 22], a statement of material facts ("CSX Facts") [Doc. No. 23], and several affidavits. [Doc. No. 24–27]. Bratton submitted his opposition on October 14, 2008, accompanied by a memorandum of law ("Pl.Opp'n") [Doc. No. 51], a statement of material facts ("Pl.Facts") [Doc. No. 30], and supporting exhibits. [Doc. No. 31–50].

The Court heard the motion on October 16, 2008, and, recognizing that CSX's reply brief was not due until October 24, 2008, took the matter under advisement. Upon consideration of the arguments, including those made in CSX's timely reply brief ("CSX Reply") [Doc. No. 54], Bratton's motion to strike portions of CSX's reply brief [Doc. No. 55], and CSX's opposition to Bratton's motion to strike [Doc. No. 56], the Court, on October 31, 2008, granted summary judgment in favor of CSX. [Doc. No. 59].

## B. Facts

For the purpose of deciding CSX's motion for summary judgment, the Court accepts Bratton's version of the facts as true, where supported by record evidence, and draws all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Bratton has Crohn's disease, an inflammatory bowel disease that causes swelling of the digestive tract and is associated with symptoms such as abdominal pain, diarrhea, rectal bleeding, weight loss, and fever. Compl. ¶¶ 7–9. As a result of his condition, Bratton underwent surgery in 1994, including removal of his large intestine, part of his small intestine, and an ileostomy.[1] *Id.* ¶ 10. Due to the ileostomy, Bratton is unable to remove waste from his body in the usual manner and typically urinates twice in a twenty four hour period. *Id.* ¶ 11; CSX Facts ¶ 12.

In July 2002, Bratton accepted employment as a conductor with CSX's Albany Division of its Northeast Region operation, *id.* ¶ 14, as a result of which he became subject to drug and alcohol testing established by the U.S. Department of Transportation and the Federal Railroad Administration, including random testing, 49 C.F.R. 219.601, and testing for reasonable cause, 49 C.F.R. § 219.301. Samples for random drug testing generally were collected at the beginning of a shift. Compl. ¶ 15. Because Bratton's condition restricted his ability to produce urine on demand, he would arrive at work each day prepared to provide a sample and would empty his bladder if one was not required. *Id.* 16.

On June 27, 2006, Bratton arrived at work, was told no sample was required, and emptied his bladder. Compl. ¶ 17. Several hours later, he was involved in a train derailment determined by CSX to be a human factor derailment, as a result of which he was subjected to drug testing. *Id.* ¶ 21.

The testing occurred at CSX's yard office in Middleboro. *Id.* ¶ 22, 23. When Bratton initially was unable to produce a urine sample, *id.* ¶ 24, 26, he was instructed to drink fluids and, in accordance with 49 C.F.R. § 40.193(b)(2), which prescribes procedures for situations in which an employee does not provide a sufficient amount of urine for drug testing, was given three hours to produce a sample. *Id.*

---

1. An ileostomy is a procedure by which a physician makes a small opening (a stoma) in a person's abdomen through which bodily waste can pass into a container for collection. Compl. ¶ 10.

¶ 26. During that period, Bratton drank approximately forty ounces of coffee and water to induce urination, but was unable to urinate. *Id.* ¶¶ 26–27. CSF Facts ¶ 15. At the end of the three hour period the examiner noted "shy bladder" on the testing report. Compl. ¶ 31.

The testing results were reported to CSX's Chief Medical Officer, Dr. Thomas J. Neilson, who, in accordance with 49 C.F.R. § 40.193(d), arranged for a special medical evaluation, the main purpose of which was to determine whether "a medical condition has, or with a high degree of probability could have, precluded [Bratton] from providing a sufficient amount of urine." 49 C.F.R. § 40.193(d)(1). Compl. ¶ 32. Dr. Dana Sparhawk performed the special medical evaluation on July 17, 2006, and, on July 27, 2006, reported to Dr. Joseph Thomasino, an independent medical review officer ("MRO"), that Bratton's medical condition "did provide a reasonable medical explanation for his being unable to produce the specimen during the requisite 3–hour period." Dr. Sparhawk Report [Doc. No. 34 Attachment B1]. After reviewing Dr. Sparhawk's recommendations, which he was required by 49 C.F.R. § 40.193(h) to "seriously consider and assess," Dr. Thomasino concluded that Bratton did not have a legitimate medical reason for failing to provide an adequate specimen and reported his conclusion to Chief Medical Officer Neilson that same day. *Id.* ¶ 36.

Relying on Dr. Thomasino's report, Dr. Neilson concluded and reported to CSX that Bratton's inability to provide a urine sample could be considered a refusal on his part to provide a sample, a so-called "refusal to test" pursuant to 49 C.F.R. § 219.104. Compl. ¶ 37. As a result of the "refusal to test" determination, CSX, in accordance with company practice, charged Bratton with insubordination. Pl. Facts ¶ 24. On October 18, 2006, CSX held an evidentiary hearing to "develop facts in connection with the notice charging Bratton with insubordination," at which Bratton, represented by a union official, presented in his defense Dr. Sparhawk's report and a letter from his surgeon. Compl. ¶¶ 38–41. By letter on October 26, 2006, CSX announced that Bratton's refusal to provide a urine sample amounted to insubordination, and dismissed him from employment. *Id.* ¶ 42.

## II. ANALYSIS

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. CSX has the initial burden of production, which it can meet by demonstrating an absence of evidence to support Bratton's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once CSX has met its burden, Bratton must "go beyond the pleadings, and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." *Id.* at 323, 106 S.Ct. 2548 (internal quotation marks omitted).

### A. The Burden–Shifting Framework

In this employment discrimination action alleging disparate treatment in violation of chapter 151B,[2] the Court must

2. Massachusetts General Laws, chapter 151B, section 4(c) makes it unlawful "[f]or any employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of

apply the familiar three-stage burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 127–28, 686 N.E.2d 1303 (1997). Bratton bears the burden of persuasion throughout. Moreover, he bears the initial burden of going forward by laying out a prima facie case of employment discrimination on the basis of handicap. *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441, 646 N.E.2d 111 (1995). Once Bratton puts forth a prima facie case, unlawful discrimination is presumed and the burden of going forward shifts to CSX to articulate some legitimate, nondiscriminatory reason for Bratton's termination. *See McDonnell Douglas Corp.*, 411 U.S. at 802–04, 93 S.Ct. 1817; *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. at 127–28, 686 N.E.2d 1303. If it does so, the burden of going forward then returns to Bratton to show that CSX's stated reason for his termination was pretextual and, if so, to persuade the factfinder that the pretext masks the forbidden discrimination. *Id.*

### B. First Stage: Does Bratton Have a "Handicap"?

█ To meet his first-stage burden, Bratton must "present credible evidence that (1) he is handicapped; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he was terminated or otherwise subject to an adverse action by his employer; and (4) the position he had occupied remained open and the employer sought to fill it." *Dartt v. Browning–*

*Ferris Indus., Inc.*, 427 Mass. 1, 3, 691 N.E.2d 526 (1998). He must establish that he has a "reasonable expectation of proving each element" of the prima facie case. *Beal v. Board of Selectmen of Hingham*, 419 Mass. 535, 541, 646 N.E.2d 131 (1995) (citing *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716, 575 N.E.2d 734 (1991)).

For the purposes of chapter 151B, the term "handicap" means "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment." Mass. Gen. Laws ch. 151B, § 1(17). Bratton relies on subsection (a), contending that he suffers from a physical impairment that substantially limits a major life activity—his ability to process bodily waste. Compl. ¶ 47; Pl. Opp'n at 8.

█ Chapter 151B, § 1(20) defines "major life activities" as "functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." It is a question of law whether the ability to process one's bodily fluid is a "major life activity" for purposes of chapter 151B, *see Bragdon v. Abbott*, 524 U.S. 624, 638, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (holding that reproduction is major life activity pursuant to ADA), a question that remains unanswered. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871–72 (2d Cir.1998) (assuming without deciding that ability to control one's waste is "major life activity"). Even if processing bodily waste is a major life activity, there is a

---

his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the

physical or mental limitations of the person would impose an undue hardship to the employer's business." There is no dispute that CSX is an employer within the context of chapter 151B, section 1(5).

question whether Bratton has put forth sufficient evidence that his impairment "substantially limits" that activity.[3] *Id.* at 871–72 (affirming summary judgment for employer because plaintiff claiming ADA violation failed to raise triable issue of fact whether her colitis substantially limited her ability to control elimination of her waste and her ability to care for herself); *Cotter v. Ajilon Serv., Inc.,* 287 F.3d 593 (6th Cir.2002) (affirming summary judgment of ADA claim where plaintiff "offered no evidence from which a reasonable jury could infer that his digestive ailment substantially limits [ability to lift, bend, stand, and carry things]"). Because, as discussed below, Bratton has failed his third-stage burden to present evidence that CSX's reason for termination was pretextual, the Court need not resolve whether he has met his first-stage burden to put forth a prima facie case.

## C. Second Stage: CSX's Reason for Bratton's Termination

 There is no dispute that CSX has produced evidence to support a legitimate, nondiscriminatory reason for Bratton's termination and therefore has fulfilled its "not onerous" second-stage burden. *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 441–442, 646 N.E.2d 111 (1995).

## D. Third Stage: Is the Reason a Pretext?

 To overcome CSX's motion for summary judgment, Bratton must establish that a genuine issue of material fact exists regarding whether CSX's proffered reason for his termination is unworthy of belief and a cover for forbidden discrimination. *See Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. at 129, 686 N.E.2d 1303. Bratton relies on two means of establishing that his termination was a pretext: first, by attempting to show that he was treated differently from similarly situated non-disabled employees, Pl. Opp'n at 17, and, second, that the process resulting in his termination was subjective and not credible. Pl. Opp'n at 10.

### 1. *Disparate Treatment*

 Evidence showing an employer's differential treatment of an employee based on his disability is the "most probative means" to demonstrate a pretext. *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. at 129, 686 N.E.2d 1303. The Massachusetts Supreme Judicial Court has "adopt[ed] the approach taken by Federal courts under Title VII," requiring a plaintiff to show he was treated differently than persons similarly situated "in all relevant aspects," *id.* (quoting *Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 19 (1st Cir.1989)), meaning "in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations." *Id.* at 130, 686 N.E.2d 1303 (quoting *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir. 1994) (internal quotation omitted)). The other employees must have been charged

---

**3.** Chapter 151B does not define the term "substantially limits," but the Massachusetts Commission Against Discrimination (MCAD) Handicap Discrimination Guidelines provide, at § II(A)(6):

"An impairment is substantially limiting if it prohibits or significantly restricts an individual's ability to perform a major life activity as compared to the ability of the average person in the general population to perform the same activity. The determination of whether an impairment substantially limits a major life activity depends on the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment."

with offenses "of comparable seriousness" with the plaintiff's offense. *Id.*

■ Bratton argues that "at least twelve similarly situated non-disabled employees have been treated differently than [he was] following a refusal to test determination." Pl. Opp'n at 18. While he does not challenge CSX's charging decision, conceding that "[t]here is no dispute that CSX [ ] charged [him] with insubordination pursuant to company policy," *see* Pl. Facts ¶ 24, he argues that he was treated differently when he was terminated: in his words, "[t]here is a dispute . . . whether . . . CSX[ ] terminated [him] in accordance with Company policy or practice." *Id.* ¶¶ 29, 72.

The Court, however, agrees with CSX that Bratton has "not come forward with the specific, detailed evidence required by established law to prove that these twelve employees were similarly situated to him." CSX Reply at 5. *See Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. at 131–33, 686 N.E.2d 1303 (affirming summary judgment for employer where employee, terminated for stealing company product, failed to produce evidence of similarly situated employees and employer produced evidence that it enforced company policy consistently). While all of the claimed comparable employees were charged with "refusal to test," the same offense as Bratton, only two of them were so-called "shy bladder" cases, where, like Bratton, an employee was unable to produce sufficient urine.[4] These cases uniquely are regulat-

ed by 49 C.F.R. § 40.193, which prescribes procedures for the test administrators, referral physicians and MROs. This "differentiating" circumstance distinguishes the situations of the other ten claimed comparable employees; they were not similarly situated "in all relevant aspects." *Ocean Spray*, 426 Mass. at 130, 686 N.E.2d 1303.

The two claimed comparable employees that were similarly situated to Bratton—those charged as a result of "shy bladder"—were both terminated, CSX Reply at 9 n. 10, and plainly were not treated differently than Bratton with respect to that decision.[5] While Bratton focuses on the fact that both later were reinstated, *see* Pl. Facts ¶ 72, that distinction avails him little. Employee # 8 was reinstated by a Public Law Board,[6] CSX Reply at 9, and Employee # 32, following a request for leniency. *Id.* at 9 n. 11. There appears to be no dispute that Bratton has not requested leniency and that he still may be reinstated by a Public Law Board, a decision that, in any event, would not be made by CSX. *Id.* at 8–9.

While the Court agrees that Bratton has failed to present evidence of similarly situated non-disabled employees who were treated differently than him, the Court rejects two of CSX's supporting arguments. First, the Court is not persuaded that employees must work in the same division under the same decision makers in order to be similarly situated. CSX Reply at 9. The circumstances here are different

---

4. Seven of the twelve employees left a test site without permission prior to completing a drug test or failed to report at all, two provided adulterated samples, and one failed to perform a breath test.

5. Moreover, CSX provided information, in response to Bratton's Interrogatory No. 9, regarding all Transportation Department employees categorized as refusals to test since July 2002, of which six were "shy bladder"

cases. All six were terminated. *See* CSX Reply at 9 & n. 10; Pl. Facts Ex. L [Doc. No. 50] at 7–13.

6. A Public Law Board is an arbitration board established at the request of a railroad or union pursuant to the authority of the Railway Labor Act, 45 U.S.C. § 153 Second. *See* CSX Reply at 8 n. 7.

from the case on which CSX relies, *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir.1999). Mr. Rodriguez–Cuervos was a Puerto Rican store manager who sought to demonstrate, in support of his Title VII claim of race discrimination, that he was treated differently than a non-Puerto Rican manager. Rodriguez–Cuervos attempted to prove this by pointing out that he received a lower rating on his evaluation than the non-Puerto Rican manager, although the men had many of the same weaknesses and areas of improvement. The court held that because the evaluations were completed by different supervisors, for different time periods, in different stores, "a comparison of the[ ] evaluations yields no evidence of discrimination, but rather evidence of different opinions by different evaluators under different circumstances." *Id.* Because employee evaluations reflect the subjective expectations of supervisors whereas disciplinary actions reflect company-wide policies, the Court is not persuaded that *Rodriguez–Cuervos* precludes Bratton from comparing himself to employees assigned to different divisions.

Turning to a case that involved disciplinary actions, in *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992), the Sixth Circuit Court of Appeals concluded that summary judgment was properly entered against a minority plaintiff who attempted to show discrimination by pointing to non-minorities disciplined more leniently for comparable conduct. The Sixth Circuit agreed that the plaintiff failed her burden, in part, because she did not show that the other employees reported to her supervisor as well. *Id.* "[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment *must have dealt with the same supervisor*, have been subject to the same standards and have engaged in the same conduct without such differentiating or

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (emphasis added). The Court finds this decision unpersuasive for two reasons: first, for purposes of discrimination claims in the Sixth Circuit, a "plaintiff must show that the 'comparables' are similarly-situated *in all respects*," and not just, as in Massachusetts, the relevant ones. *Id.* Second, the Court agrees with Judge Stearns in this District, who expressly has rejected the Sixth Circuit's reasoning, writing: "[t]o the extent that [*Mitchell*] can be read . . . to require an employee to compare herself only with other employees disciplined by the same supervisor, I cannot agree, particularly where a company has instituted company-wide standards of discipline . . . intended to provide guidance to all company supervisors." *Petsch–Schmid v. Boston Edison Co.*, 914 F.Supp. 697, 705 n. 17 (D.Mass.1996) (Stearns, J.) (denying employer's motion for summary judgment on sex discrimination claim).

The Court also rejects CSX's argument that certain employees were not similarly situated to Bratton because they "held different jobs" than he did. CSX Reply at 10. Because the regulations provide for reasonable cause or random drug testing of any "covered employee," 49 C.F.R. § 219.301, defined as one "who has been assigned to perform service in the United States subject to the hours of service laws during a duty tour," 49 C.F.R. § 219.5, job title is not "relevant" here for purposes of the *Ocean Spray* analysis. 426 Mass. at 129, 686 N.E.2d 1303.

### 2. *Unworthy of Credence*

■ The second means by which Bratton seeks to establish pretext is to show that CSX's insubordination determination was "not credible." *See* Pl. Opp'n at 10–11. He first points to a lack of "smoking

gun" evidence that he was impaired on the day of the derailment or deliberately refused to test, arguing that the "termination decision was based solely on the opinion of Dr. Thomasino [the MRO], even though [Thomasino] disregarded Dr. Sparhawk's [the referral physician's] medical opinion without ever having examined or spoken to [Bratton]." *Id.* at 10–12. Second, he argues that the CSX decision makers "acted in bad faith" by failing to consider Bratton's disability, failing to maintain objectivity, and willfully ignoring mitigating circumstances. *Id.* at 12–13.

Rather than supporting Bratton's claims, however, the record supports a conclusion that, in terminating Bratton, CSX acted in accordance with Federal law and its own policies, and not in bad faith. First, CSX was required to adopt the MRO's determination of refusal to test. *See* 40 C.F.R. § 40.149; *U.S. Dep't of Transportation, Office of Drug and Alcohol Policy and Compliance, What Employers Need to Know About DOT Drug and Alcohol Testing,* 29 (Aug. 25, 2008) [Doc. 25, Ex. C]. Once that occurred, CSX charged Bratton with insubordination in accordance with its policy, a fact he concedes. Pl. Facts ¶ 24. Insubordination, according to CSX's Individual Development and Personal Accountability Policy, is a "major offense" warranting "removal from service pending a formal hearing and possible dismissal from service for a single occurrence if proven responsible." [Doc. No. 26, Ex. C, at 5]. CSX gave Bratton, at the October 2006 hearing on the insubordination charge, the opportunity to present evidence and to cross-examine Dr. Thomasino prior to dismissing him from service. Pl. Facts ¶¶ 27, 28.

Moreover, the Court rejects Bratton's comparison to *City of Salem v. Massachusetts Commission Against Discrimination,* 44 Mass.App.Ct. 627, 643, 693 N.E.2d

1026 (1998), where the Massachusetts Appeals Court concluded that substantial evidence supported a conclusion that a police chief's reason for declining to hire a minority applicant was pretextual. The Appeals Court observed that "the chief's utilization of an open-ended, uncontrolled, and, by his own admission, 'ad lib' hiring process," contributed (along with other concerns) to a finding that the reasons given for bypassing the applicant were a pretext. *Id.* at 644, 693 N.E.2d 1026. Similarly here, Bratton argues, pretext is indicated by the "one-sided determinations of responsibility" made by CSX officials like manager William Braman who, in Bratton's words, "conducted his investigation into whether or not [Bratton] was responsible for insubordination differently than he has for other employees." Pl. Opp'n at 14. Pointing to Braman's deposition testimony, Bratton argues that Braman failed to follow his usual practice of speaking with supervisors of employees charged with refusing to test. *Id.* Braman merely testified, however, that he did not recall speaking with any CSX employee about the incident. *See* Braham Deposition [Doc. No. 40] at 63. Furthermore, Braman testified that he took the same steps in making the decision to terminate Bratton that he took in making prior termination decisions. *Id.* at 85. He did not engage in the sort of "ad lib" process described by the Massachusetts Appeals Court in *City of Salem,* 44 Mass. App.Ct. at 644, 693 N.E.2d 1026.

As with his failure to show disparate treatment, summary judgment is appropriate because Bratton has failed to designate specific facts showing there is a material issue regarding the credibility of CSX's termination decision.

### III. CONCLUSION

■ While "[s]ummary judgment is a disfavored remedy in the context of dis-

crimination cases based on disparate treatment," *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 439, 646 N.E.2d 111 (1995) (citations omitted), it "is not always inappropriate." *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. at 127, 686 N.E.2d 1303 (affirming order of summary judgment against employee who failed to show that reason for termination was pretext). For the reasons stated above, on October 31, 2008 the Court granted CSX's motion for summary judgment, [Doc. No. 59], and administratively closed the case pending resolution of any avenues of reinstatement still available to Bratton. [Doc. No. 60].